CARNES, Circuit Judge:
In the early morning hours of December 17, 1995, Robert Wayne Holsey robbed a convenience store in Milledgeville, Georgia, and fled. Minutes later his car was stopped by Baldwin County Deputy Sheriff Will Robinson. The deputy, who was twenty-six years old, approached the vehicle. Holsey shot him dead. Fourteen months later, in February of 1997, a jury convicted Holsey of malice murder and armed robbery. The jury fixed his sentence at death on the malice murder conviction, and the court imposed that sentence. He has been on Georgia’s death row for the past fifteen years.
During those fifteen years, Holsey has exhausted his state court direct appeal and state postconviction challenges. See Holsey v. State, 271 Ga. 856, 524 S.E.2d 473 (1999) (direct appeal) [Holsey I]; Holsey v. Schofield, No.2000-V-604, Sup.Ct. of Butts Cnty. (May 9, 2006) (Final Order on Amended Petition for Writ of Habeas Corpus) [Holsey II ]; Schofield v. Holsey, 281 Ga. 809, 642 S.E.2d 56 (2007) (collateral appeal) [Holsey III]. Holsey’s convictions and death sentence were affirmed on direct appeal. Holsey I, 524 S.E.2d at 480. In the state postconviction proceedings, the trial court vacated Holsey’s death sentence, concluding that his trial lawyers had rendered ineffective assistance at the sentencing phase of Holsey’s trial in regard to presentation of mitigating circumstances evidence about his limited intelligence and his troubled, abusive childhood. Holsey II, No.2000-V-604, at 82-84. The Supreme Court of Georgia reversed, however, holding that Holsey had not shown that he was prejudiced by his trial lawyers’ alleged failures. Holsey III, 642 S.E.2d at 60-62.
In November 2007, Holsey filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus. The district court denied that petition on July 2, 2009. Holsey v. Hall, No. 3:07-cv-129(CDL) (M.D.Ga. July 2, 2009) [hereinafter Holsey TV]. Holsey moved for a certificate of appealability, which the district court granted on two issues:
(1) Whether reasonable jurists could disagree that the Georgia Supreme Court’s decision, which reversed the grant of sentencing relief as to [Holsey’s] ineffective assistance of counsel claim, was based on unreasonable determinations of fact, and/or on an unreasonable application of clearly established federal law, and/or was in contravention of clearly established federal law; [and]
(2) [Whether] the Georgia Supreme Court’s affirmance of Georgiá’s unique reasonable doubt standard for mental retardation claims contravenes and/or unreasonably applies established U.S. Supreme Court precedent prohibiting the execution of mentally retarded offenders and mandating federal Due Process constraints on state burdens of proof meant to protect fundamental federal constitutional rights. (Quotation marks omitted.)
After the district court granted the COA on those issues, we resolved the second issue in another case. In Hill v. Humphrey, 662 F.3d 1335, 1360-61 (11th Cir. 2011) (en banc), we held that the Georgia *1232 Supreme Court’s decision affirming the state’s reasonable doubt standard for mental retardation claims did not contravene clearly established Supreme Court precedent. Our Hill decision disposes of the second COA question. This opinion addresses the first one.
I. THE TRIAL
On January 8, 1996, a Georgia grand jury indicted Holsey for malice murder, felony murder, and armed robbery. Four days later the State filed a notice of its intent to seek the death penalty. The trial court appointed Andrew Prince as lead counsel to represent Holsey at trial, and Brenda Trammel served as Prince’s co-counsel.
A. The Guilt Phase
The guilt phase of Holsey’s trial began on February 1, 1997. As the Supreme Court of Georgia has recounted, the State at the guilt phase proved the following:
Robert Wayne Holsey robbed a Jet Food Store in Milledgeville with a handgun shortly before 1:30 a.m. on December 17, 1995. Holsey received money from both the cash register and the lottery machine after telling the ■store clerk, “Bitch, I want you to give me all your money.” Holsey’s voice was recorded on the store’s surveillance videotape and was identified at trial by Holsey’s girlfriend. Holsey fled the convenience store in a red Ford Probe automobile he had borrowed from his sister’s girlfriend earlier that night. The red Probe was stopped at the Royal Inn Motel approximately four minutes later by Deputy William Edward Robinson, IV. Deputy Robinson made a radio call identifying the red Probe’s license plate number and then approached the automobile holding a flashlight. Deputy Robinson received two bullet wounds, one to his right arm and one to the back of the right side of his head. Deputy Robinson managed to fire several shots before sustaining the fatal head wound.
After the shooting, another deputy spotted the Probe and turned his patrol vehicle around to give chase, but the Probe sped away and escaped. Witnesses observed the Probe traveling at a high rate of speed through a red light and into lanes of oncoming traffic. One witness who knew Holsey testified that she saw him alone in the Probe as it passed by at the red light.
Having thus far evaded capture, Holsey called his girlfriend, Mary Jackson, and asked her to pick him up at his sister’s house. He specifically directed Jackson to come in her blue Jeep Cherokee vehicle rather than in her burgundy-colored automobile. When Jackson arrived at Holsey’s sister’s house, Holsey called to Jackson from behind a fence on a hill. Holsey had changed clothes since he left Jackson’s house several hours earlier. Jackson refused Holsey’s request to take him to his mother’s house so he could monitor a police scanner, but Jackson did agree to his request to drive him past the motel where the murder had occurred and then back to his sister’s house by way of back roads. When back at his sister’s house, Holsey directed Jackson to park her Jeep Cherokee behind the Probe to conceal its license plate. As Holsey and Jackson sat in the parked Jeep Cherokee, a police officer spotted the Probe and verified that its license plate number matched the license plate number in the victim’s radio call. Holsey exited the Jeep Cherokee, refused the officer’s command to put his hands up, looked around as though searching for an escape route, and then ultimately surrendered.
Law enforcement officers discovered, hidden near Holsey’s sister’s house, clothing that matched the clothing worn *1233 by the armed robbery perpetrator and a hat belonging to Jackson’s son. The murder weapon was concealed nearby and was later found by a civilian. Holsey’s tennis shoes were taken from him after his arrest, and expert testimony showed that one of the shoes had blood on it with DNA consistent with the victim’s blood. Holsey gave strong physical resistance and screamed loudly when officers initially attempted to conduct a gunshot residue test on his hand. A trace metal detection test of Holsey’s hand was administered later and rendered a result consistent with Holsey’s having held the murder weapon, which was metal with wooden grips. A bullet recovered from the Probe was matched with Deputy Robinson’s service weapon. The bullet retrieved from Deputy Robinson’s head during his autopsy was matched with a handgun belonging to Holsey’s girlfriend, Mary Jackson. Jackson testified that Holsey admitted to her after the murder that he had taken the handgun.
Holsey III, 642 S.E.2d at 59.
On February 11, 1997, the jury returned a verdict finding Holsey guilty of malice murder, felony murder, and armed robbery, although “[t]he felony murder conviction was vacated by operation of law.” Id. at 475 n. 1. The sentencing phase of Holsey’s trial began the next day.
B. The Sentencing Phase
At the start of the sentencing phase, the jury learned about Holsey’s criminal record for the first time. The State introduced his 1983 guilty plea conviction for armed robbery with serious bodily injury. For that crime, the state trial court had sentenced Holsey to be “confined at labor for twenty years,” with fifteen years to be served in prison. The State called Scott Maher to testify about facts underlying the conviction. Maher testified that he was working as a night clerk at a Milledgeville convenience store on July 8,1983. Holsey, who was eighteen years old at the time, entered the store, hit Maher in the face with a brick, and emptied the store’s cash register.[1] After Maher’s testimony, the State introduced evidence that Holsey was paroled in July 1990 after serving seven years of that sentence and placed on probation for the remainder of his sentence.
The State next introduced Holsey’s 1992 guilty plea convictions for two counts of aggravated assault and one count of possession of a firearm by a convicted felon. Based on those convictions, the state trial court had revoked his probation for the 1983 armed robbery conviction and ordered him to serve the remaining term of that sentence in prison. The court had also sentenced Holsey to five years probation for the three 1992 convictions, to run consecutively with the remainder of the sentence for the 1983 conviction. The jury heard all about that at the sentencing phase of Holsey’s capital murder trial.
The jury also heard more details concerning the crime leading to Holsey’s three convictions in 1992 for aggravated assault and felon in possession. Kenneth Simmons testified that, while he was at the Soul Master’s Lounge in Milledgeville on February 22, 1992, Holsey attacked him from behind and stabbed him four times with a knife. As a result of Holsey’s attack, Simmons was knocked out and suffered a punctured lung. Scotty Simmons, who is Kenneth Simmons’ first cousin, testified that he was at the Soul Master’s Lounge when Holsey attacked Kenneth Simmons. After the attack, Scotty Sim *1234 mons decided to “go get” Holsey and do him some harm, but Holsey fired a rifle at him seven or eight times.[2] The State rested.
Holsey’s attorneys, Prince and Trammel, then presented evidence of mitigating circumstances. Trammel began by playing for the jury the videotaped deposition of the owner of the Soul Master’s Lounge. His name is Clifford Holsey, although he is not related to petitioner Robert Wayne Holsey. (We will refer to this witness as “Clifford” to avoid confusion.) The first thing that Clifford testified about was the night Holsey stabbed Kenneth Simmons. He said that Kenneth and Scotty Simmons had gone to the Soul Master’s Lounge that night to attack Holsey. He also told the jury that, although he did not see the stabbing, Holsey had acted in self-defense.
Trammel also questioned Clifford about Holsey’s childhood. Clifford testified that Holsey grew up in Clifford’s neighbor hood, so he had known Holsey since Holsey was a small child. Trammel asked Clifford “to tell the jury what [he knew] about [Holsey] and the circumstances of his home life” growing up. Clifford responded:
Well, I think [Holsey] came up the best that he could. I think he was neglected from his mother. She, you know, kinda of like — came up kind of like child abuse. And she just didn’t see about them, you know, kind of walked all over them a little bit, and done everything.
[Holsey] and [his siblings] were really not cared for and — I don’t know. But I believe [Holsey] might have left home that one time because their mother was really tough on them. I think she was out kind of like courting around a little bit ....
Clifford also told the jury that Holsey grew up without his dad, who had moved to Detroit after being shot and paralyzed, and that he had heard Holsey had a bed-wetting problem until he was about twelve years old.
Clifford explained to the jury that Holsey and his siblings dressed as “[b]est they could by living in the projects” and that their house was “rough” and infested with cockroaches. Trammel asked Clifford, “Did you ever see [Holsey’s mother] put her arms around her children and tell them that she loved them?” He answered, “Never done that.” Clifford testified that he had heard Holsey’s mother admit that she would curse at, “scold[,] ... and beat” her children. He told the jury that Holsey’s mother threatened her children and often left them home alone because she cooked at night for the Soul Master’s Lounge. Clifford explained that despite his bad life while a child, Holsey was not a “bad person” but instead was “quiet and kept a smile on his face.”
Trammel asked Clifford about Angela Holsey, who was Holsey’s second-oldest sister. Clifford said that Angela had spent time in “special ed when she was small.” According to Clifford, “[s]he did have problems.”
After the jury watched Clifford’s videotaped deposition, Prince and Trammel called eight more witnesses to testify live: Delores Cook, Belinda Hawkins, Freda Webb, Ferrlando Jones, Otis Paschal, Sandra Kendrick, Regina Reeves, and Demetra Holsey. The jury heard first from Delores Cook, who was a cook at the Baldwin County Jail where Holsey was incar *1235 cerated after his 1992 convictions. She testified that Holsey had worked in the kitchen as a “trustee” giving “out trays to the other inmates.” According to her, Holsey was “courteous” and “respectful” and did not cause any trouble.
The jury then heard from Belinda Hawkins, a friend of Holsey’s. Hawkins testified that she and Holsey went together to the Soul Master’s Lounge on February 22, 1992. According to Hawkins, Holsey told her later that Kenneth Simmons had hit him in the head with a brick and then three men attacked him. She insisted to the jury that Holsey “didn’t start no fight” that night.
Freda Webb, a jailer for the Jasper County Jail, was the next witness. She testified that she knew Holsey as an inmate at the Jasper County Jail where he had been awaiting trial on the malice murder, felony murder, and armed robbery charges. She described Holsey as “a real courteous[,] ... model inmate[ ].” Webb also testified that she did not believe that he “should get the electric chair” or that he would be a danger to others in prison.
After Webb testified, Prince called three of Holsey’s former coworkers from the Milledgeville Pizza Hut. The first was Ferrlando Jones, the restaurant’s assistant manager. He testified that Holsey was not a violent person, that he got along with the restaurant’s other employees, and that he did what he was told to do. Otis Paschal, the restaurant’s manager, testified that Holsey “was a very good employee,” was “dependable,” did what he was told, and got along well with others. He also told the jury that Holsey was “the quiet type” and that he never saw any violent tendencies in Holsey. The last former Pizza Hut coworker to testify was Sandra Kendrick, one of Holsey’s supervisors at the restaurant. She testified that Holsey was a good employee. She also told the jury that she was at the Soul Master’s Lounge when Holsey stabbed Kenneth Simmons in 1992 and that Simmons had started the fight by hitting Holsey “beside the head.”
Prince next called Holsey’s oldest sister, Regina Reeves, to testify.[3] Reeves is a former marine, a former Baldwin County deputy sheriff, and a Deputy United States Marshal. Prince began the examination by asking Reeves about the fight when her brother stabbed Kenneth Simmons. Reeves said that she did not witness the fight but that during it her brother had suffered head injuries requiring stitches. Prince asked her about Holsey’s incarceration at the Baldwin County Jail, which began in 1992. According to Reeves, through good behavior Holsey had earned “trustee status,” which gave him more freedom within the jail than nontrustee inmates. Jail officials entrusted Holsey with miscellaneous tasks at the jail and allowed him to drive a truck.
Reeves also testified about Holsey’s childhood. She told the jury that Holsey is a middle child. He has two older sisters, Reeves and Angela, and two younger ones, Demetra and Lisa. Reeves, Angela, and Holsey have the same father, but he is not the father of Demetra and Lisa. Holsey’s father was shot and paralyzed two months before Holsey was born. The family moved to Detroit after Holsey was born so that his father “could get better medical attention.” While they lived in Detroit, Holsey’s sister Demetra was born, and after five years in Detroit, Holsey’s mother and her children moved back to Milledge *1236 ville, leaving Holsey’s father behind. According to Reeves, Holsey never “really knew [his father] at all.”
Back in Milledgeville, Holsey and his now-four sisters (Lisa was born after they moved back to Milledgeville) lived with their mother, usually in public housing. Their mother received public assistance to help provide for her family, but Reeves testified that “things were horrible” in their household. She recounted how their mother would often beat the oldest three children: Reeves, Angela, and Holsey. Because she “hated it there” and “was tired of taking beatings,” Reeves left home when she was seventeen years old and joined the Marine Corps. She later became a Deputy Sheriff and then a Deputy United States Marshal.
Reeves told the jury about Holsey’s mother’s involvement in his life. She testified that their mother had once been hospitalized for psychiatric problems and pointed out that she had not even bothered to show up for the sentencing phase of her son’s trial. According to Reeves, Holsey’s mother had not been there for most of his life. And although their mother had men in and out of the home while they were growing up, none of those men had spent any time with Holsey. Instead, Reeves testified that raising Holsey and her other siblings was “left up to [her],” and without a mother or father around, Holsey “more or less” grew up on the street.
Prince asked Reeves about Holsey’s school performance. She testified that he “didn’t do well” and told the jury that he “might have made it to the tenth grade,” but didn’t complete that grade. Teachers had usually just assigned Holsey to the next grade instead of actually passing him into that grade. During Reeves’ testimony, Prince introduced Holsey’s school records into evidence, and he asked Reeves to read from a section entitled “teacher’s remarks.” Reeves then testified:
A: ... For the first grade says, a weak student in readiness materials. Second grade says, very slow, needs help from home. Third says, poor worker. Fourth says, poor worker. Fifth says, can be controlled with firm discipline and a few kind words. Very, very low I think it says.
Q: The part I’m interested — can be controlled with discipline and a few kind words.
A: Yes.
Q: And needs help from home.
A: Yes.
Q: Now, did [Holsey] get any help from home from his Mama?
A: No.
Q: Did he get a few kind words from his Mama?
A: Back in those times, no.
Reeves also testified that, after spending some time in foster care, as a teenager Holsey had lived for a time at the Georgia Department of Human Resources’ Youth Development Center. Prince introduced into evidence Holsey’s records from that center, which showed that his mother voluntarily admitted him to the center in January 1980, when he was fourteen years old.
Those records also include a pyschosocial evaluation of Holsey that was prepared by a behavioral specialist and a psychologist on July 31, 1980. According to that evaluation, when Holsey was fourteen years old, he was expelled from school because he “pulled a butcher knife (which he had brought from home)” and held it to another student’s throat and “hit him in the face but did not cut him.” A juvenile complaint report, which also was in the Youth Development Center records, stated that the school had ordered Holsey not to return unless his mother accompanied him.
*1237 Other evidence showed that Holse/s mother did not accompany him back to school. At Prince’s request, Reeves read from a juvenile complaint report contained in the records:
The first part says ... that [Holsey] was basically a runaway case. He has no supervision at home and refuses to return home. Says Mrs. Holsey would not go to the school, and sent a note with [him]. [Holsey] was not allowed to return. When he tried to come back the principal called the police to remove [him].
Prince also asked Reeves to read a section of the psycho-social evaluation to the jury, which described Holsey as borderline mentally retarded:
“[Holsey] evidenced an inappropriate effect during the evaluation. He smiled inappropriately and had difficulty maintaining thought patterns. At times he appeared unaware of his immediate environment, and in a world of his own.” Another paragraph says, “present testing indicates [Holsey] functions in the borderline mental retardation range of intelligence .... [H]e appears as an anti-social individual who thrives on taking risks or thrill seeking. He exhibits an inability to plan ahead and make short or reckless disregard for the consequences of his actions. His socialization relationships are shallow, and he can be expected not to show strong loyalties to others because his intelligence is so low his dislike for social convention is likely to result in his being caught often.”
Reeves also recounted to the jury that the evaluation stated that academic testing had showed that Holsey, who was fifteen years old at the time of testing, functioned at a third-grade level.
Another part of the evaluation, which was introduced into evidence, states that “[personality testing indicates [Holsey] is not showing any distress or guilt” about putting the knife to his schoolmate’s throat and that “[h]is social adjustment is so marginal if something is not done soon he will continue to cause problems.” The evaluation reflected that Holsey had taken an IQ test on July 28, 1980, and scored a 70. The evaluation concluded that Holsey “is probably seriously disturbed.” A summary of a home evaluation conducted by the Youth Development Center, also contained in the records submitted into evidence, stated that Holsey’s mother “has no idea how to control [him] without resorting to excessive punishment.”
The Youth Development Center records admitted into evidence at the sentencing phase also contained a psychiatric evaluation of Holsey prepared by Dr. Fred Trest, one of the center’s psychiatrists. Dr. Trest had concluded that Holsey suffered a “behavioral/personality disorder, which includes ... [an] antisocial component” and that “his intelligence seems to be borderline.” Holsey had told Dr. Trest that neither he nor his siblings had been treated “neglectfully” or had “received physical or verbal abuse from his mother,” but “he readily admitted] ... that he has felt relatively rejected by his mother for his younger siblings.” He also told Dr. Trest that his mother “ ‘yell[ed] at him,’ ” “infrequently ‘slap[ped] him on the head,’ ” and “intermittently spanked him with a belt” as punishment when he misbehaved. And Holsey “reveal[ed] that his mother’s present boyfriend is a friend to him ... [who] takes him fishing and boat riding, and plays football with him.”
Dr. Trest’s evaluation reported that Holsey was twice suspected of attempting suicide while at the Youth Development Center but that Holsey denied it. The evaluation concluded that, at the time, Holsey “has just barely as many antisocial behaviors as must be present in the child *1238 hood histories of adults who are diagnosed as having antisocial personality disorders.” Dr. Trest also wrote that Holsey admitted “to having had the antisocial urge to steal in the past.”
The Youth Development Center records also contained a “social history” of Holsey written by Rosa Marks, a center social worker. Marks wrote the history sometime after Holsey was admitted to the center, and she noted that he “was doing fair in school until a year ago.” She summarized Holsey’s situation: “[His] strength is in his physical environment and his average intelligence]. His limitations lie[] in his inability to express himself adequately. His mother has given up all hopes and has little interest in [Holsey].”
In addition to eliciting testimony from Reeves about Holsey’s troubled, abusive childhood, Prince asked her about Holsey’s other older sister, Angela. Reeves testified that Angela was a violent person, had problems at school, was sometimes bad to her children, and had been hospitalized several times at Central State Hospital for mental problems. The first time that Angela was admitted to Central State Hospital was when “she was kicked out of public school in the fourth grade” because “[t]eachers were horrified of her.” According to Reeves, Angela attended special education classes while she was at Central State Hospital.
Reeves said that as a child Holsey had rarely gotten into any trouble on his own but instead “it was usually ... with or because of ... Angela.” She told the jury that to get reward money Angela had turned Holsey in to the police for his 1983 armed robbery. To Reeves, at least, Angela’s betrayal was not surprising; still, Holsey never confronted Angela about it.
Prince introduced into evidence Angela’s medical records from Central State Hospital. Those records show, among other things, that when Angela was eleven years old the Juvenile Court of Baldwin County ordered her admitted to Central State Hospital for a “neurological work-up, electro-encephalogram, and a complete review and evaluation of her personality.” During that court-ordered stay, hospital officials found her to be in “the Borderline range of intellectual functioning” and concluded that “the consideration of Mild Mental Retardation cannot be entirely ruled out.” The officials found that Angela’s personality “reflected a great deal of hostility, insecurity, and depression and indicated that Angela was easily angered, could not control her anger, and did not understand it, partially due to her intellectual level.” And a Central State Hospital evaluation when Angela was sixteen years old “considered [her] to be functioning in a mild mental retardation range.” All of that evidence was put before the jury.
Finally, Reeves told the jury about her brother’s character. She stated that he has “always been mostly quiet” and she “used to tease him ... about things because he was always small and skinny.” But, she testified, “he’s always ... been the type that if you’re his friend or if you’re ... family ... he sticks up for you. He stands ... by you ... no matter what.” According to Reeves, Holsey would do just about anything to protect his sisters and his mother. She believed that he did not have the ability to take advantage of the same opportunities that she did because he does not have “what you would call good social skills. [He’s] never really been, you know, that good in school.”
As Holsey’s ninth and last witness during the sentencing phase, Trammel called Demetra Holsey, one of Holsey’s younger sisters. Pleading with the jury to spare her brother’s life, she testified:
[Wjhenever I need[ed] him he was there .... No matter what the problem was, if he could help us he would. When times got hard with me, when people put *1239 me down I always had somebody I could go to that would lift my head up and let me know I am somebody. No matter what you said, you couldn’t take that away from me. You know, I was always picked at because of my size. He always told me I was beautiful, no matter what. People look at me from the inside, not the outside. Just keep my head up and one day God will bless me.
I’d just like to say please, I beg of you, spare his life .... I never had a father. My real father died when I was a baby. He was my only father figure .... There’s some good in everybody .... I don’t have no other male figure in my life. I have a child of my own, and his father’s gone ..., and I got to live a single mother’s life ---- But I need something. If it ain’t but a little bit, just please leave me something.
The parties then presented their closing arguments. The prosecutor began by telling the jury that the State had proven four statutory aggravating circumstances: (1) “Holsey committed murder against a peace officer ... while [that peace officer] was engaged in the performance of his official duties,” see Ga. Code Ann. § 17-10-30(b)(8); (2) “Holsey shot and killed Will Robinson for the purpose of avoiding, interfering with, or preventing a lawful arrest of himself,” see id. § 17 — 10—30(b)(l0); (3) “Holsey murdered Will Robinson while, he was engaged in the commission of another capital felony, ... armed robbery,” see id. § 17 — 10—30(b)(2); and (4) “Holsey ... murdered Will Robinson while he had a prior record of conviction for a capital felony, .... [the 1983] armed robbery,” see id. § 17-10-30(b)(l).
The prosecutor then discussed Holsey’s evidence of mitigating circumstances. He said:
Ladies and gentlemen, yes, the defendant did not have a perfect childhood. The fact that his sister turned him in for an armed robbery to get a reward, does that justify his robberies and killing a police officer?
Yes, he’s got another sister that has got some mental problems. Does that justify what he’s done? No doctors have told us that Robert Wayne Holsey has any mental problems.
Regina Holsey, she grew up in that same family. Same mother, same father, same household. When Regina turned 18 years old, she wanted to make something of her life. She joined the United States Marine Corps----
When [Holsey] turned 18, he robbed a Corral Convenience Store. And you heard him take that brick, and he smashed it in the face of Scottie Maher. Same age as Regina, same parents, same environment, same conditions.
... Robert Wayne Holsey is the ox that gores and gores again.
Trammel presented closing arguments on behalf of Holsey. She began by acknowledging that the State had proven four statutory aggravating circumstances. She then defined a mitigating circumstance for the jury as “anything that you want to consider or may consider that might just indicate to you that the ultimate punishment in this case is not what should be given.”
Trammel highlighted for the jury Holsey’s troubled, abusive “home life,” noting that he “grew up by himself.” Arguing that “[w]e don’t all start equally,” Trammel told the jury that Holsey “had nothing that every child deserves to have. He was deprived of everything.” He “had a mother who wouldn’t even go to the school so he would get back in.”
She also highlighted Holsey’s limited intelligence, telling the jury that Holsey is *1240 “borderline mentally retarded.” She reiterated that point by reminding the jury that he “was just assigned [to grades] for school” and that by the time he was eighteen years old he still could not sign his name. Finally, she asked the jury to consider any lingering doubt it might have about Holsey’s guilt to weigh in favor of not imposing the death penalty.
The court instructed the jurors that it was their “duty to determine within the limits prescribed by law what punishment [would] be imposed in this offense” and told the jurors that they were “authorized to consider all of the evidence received here in court in both stages of this proceeding presented by the State and the defendant.” After deliberating for less than two hours, the jury returned a verdict finding that the State had proven four statutory aggravating circumstances and fixing Holsey’s sentence at death for the malice murder conviction. The state trial court imposed that sentence for that conviction and also sentenced Holsey to life imprisonment for the armed robbery conviction.
On direct appeal the Georgia Supreme Court affirmed Holsey’s convictions and the death sentence. Holsey I, 524 S.E.2d at 480. The court found, “considering both the crime and the defendant, that the sentence of death was neither excessive nor disproportionate to the penalties imposed in similar cases.” Id. The United States Supreme Court denied Holsey’s petition for a writ of certiorari, Holsey v. Georgia, 530 U.S. 1246, 120 S.Ct. 2695, 147 L.Ed.2d 966 (2000), and-his petition for rehearing, Holsey v. Georgia, 530 U.S. 1297, 121 S.Ct. 17, 147 L.Ed.2d 1041 (2000).
II. STATE POSTCONVICTION PROCEEDINGS
After the Supreme Court denied certiorari, Holsey filed a petition for a writ of habeas corpus in Georgia state court raising thirteen grounds for relief. One of those grounds for relief, which is the only remaining ground at issue in this appeal, was that his trial lawyers rendered ineffective assistance at the sentencing phase by failing to present enough mitigating circumstance evidence of his limited intelligence and of his troubled, abusive childhood.
The state collateral court held an evidentiary hearing on June 16-18, 2003, and December 8-9, 2003. Holsey called eight witnesses to testify: Dr. Mark Cunningham, Dr. Jethro Toomer, Brenda Trammel, Ronald Singer, Judge L.A. McConnel, Jr., Cathy Crawford, Regina Reeves, and Andrew Prince. He also submitted 224 exhibits, including the deposition testimony of nineteen people, the affidavits of fifty-two people, and his Department of Corrections records. The State called nine witnesses to testify: Dr. Thomas Sachy, Evelyn Luton, Dr. Kris Sperry, Mark Robinson, Sheriff William Masse, Jr., Fred Bright, Ricky Horn, Jimmie Baggett, and Howard Sills. The State submitted 220 exhibits.
The state collateral court vacated Holsey’s death sentence, concluding that his trial lawyers had rendered ineffective assistance at the sentencing phase of Holsey’s trial in regard to the presentation of mitigating circumstances evidence about his limited intelligence and his troubled, abusive childhood. Holsey II, No.2000-V-604, at 82-83. The Georgia Supreme Court assumed that Holsey’s trial lawyers had rendered deficient performance, but it reversed the state collateral court. The Georgia Supreme Court held that even if Holsey’s trial lawyers were deficient, Holsey had not shown that he was prejudiced by that deficiency. Holsey III, 642 S.E.2d at 60-62.
The State contends that Holsey’s trial lawyers did present enough mitigating eir *1241 eumstances evidence at the sentencing phase. Because the Georgia Supreme Court’s conclusion that Holsey was not prejudiced by his trial lawyer’s assumed deficiencies was neither an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts, we will assume that Holsey’s trial lawyers were deficient, as the Georgia Supreme Court did.
A. Mitigating Evidence Presented at the State Collateral Evidentiary Hearing
During the evidentiary hearing Holsey’s collateral counsel called two witnesses to testify about his limited intelligence — Dr. Mark Cunningham and Dr. Jethro Toomer. They called his oldest sister, Regina Reeves, to testify about his troubled, abusive childhood. As additional evidence of his limited intelligence and troubled, abusive childhood, they submitted the deposition testimony of eight people and the affidavits of twenty-nine more. Holsey’s collateral counsel also submitted some documentary evidence, including his Department of Corrections records.
1. Holsey’s Witnesses
a. Dr. Cunningham The first witness to testify for Holsey at the evidentiary hearing was Dr. Mark Cunningham, a clinical and forensic psychologist whom the court recognized as an expert in those fields. He was hired to evaluate Holsey’s intellectual status and determine whether he is mentally retarded.[4]
Dr. Cunningham gave his opinion that Holsey is mildly mentally retarded. He explained that:
There’s a broad misconception that the public has that somebody who’s mentally retarded is slobbering and stuporous and can’t fasten their clothes correctly and is unable to hold a job, could never learn to read or write at all. In other words, the popular notion of what it means to be mentally retarded in fact is more descriptive of somebody who is severely to moderately retarded .... And so there are broad misconceptions in the community about what it means to be mentally retarded and what somebody who’s mildly mentally retarded can do or not do.
Dr. Cunningham’s diagnosis of Holsey as mildly mentally retarded was based on the definition of mental retardation in the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders. See Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) [hereinafter DSM-IV]. According to him, DSM-IV “is the diagnostic classification system that’s utilized by psychologists and psychiatrists so that [they] are all talking about the same disorder.” Dr. Cunningham also explained that DSM-IV is accepted within his professional community, and its definition of mental retardation is consistent with the definition provided by the American Association of Mental Retardation, which is “an association that began in 1876 and represents the primary professional organization” concerned with mental retardation.
Dr. Cunningham testified that a diagnosis of “[m]ental retardation has three prongs to it.”[5] The first is that the person must have intellectual abilities that are “significantly subaverage, which is defined as ... an IQ score of approximately 70 or *1242 below.” However, the DSM-TV and the AAMR recognize that “an IQ score of 75 and below [c]ould also qualify because, in fact, that may well represent a true IQ that’s less than 70 with [an] error component taken into consideration.”
The second prong of a mental retardation diagnosis is a significant impairment in adaptive behavior, which means significant impairment in at least two of ten adaptive behavior categories listed in the DSM-IV. Those ten categories are communication, self-care, home living, social interpersonal skills, use of community resources, functional academic skills, self-direction, work, leisure, and health and safety. According to Dr. Cunningham, there are two standardized tests an evaluator can administer to determine whether someone has a significant impairment in adaptive behavior: the Vineland Social Maturity (or Adaptive Behavior) Scales or the AAMR’s Adaptive Behavior Scales.[6] Dr. Cunningham described those tests:
Typically, the adaptive behavior scales use a respondent who has had close observation of the individual ..., you’re talking to [someone] who has had experience observing this person in various roles and in intimate daily life activities over an extended period of time. And you then query this person in a very detailed sort of way, following the questions that are laid out in the scale about what this person can do or is not able to do.
Dr. Cunningham also explained that an evaluator can “get information on an anecdotal basis by interviewing or getting depositions from a broad variety of third parties, and that provides additional information about somebody’s adaptive behavior capabilities.”
The third prong of a mental retardation diagnosis is that there must be “the onset of mental retardation before the age of eighteen.” Dr. Cunningham explained that there are degrees of mental retardation. “The highest functioning level of mental retardation is called mild mental retardation[, which is] a misnomer because there’s nothing mild about this condition. It’s a catastrophic disability.”[7] According to Dr. Cunningham, mild mental retarda *1243 tion represents an IQ score from 50 to about 70 or 75. Below it is moderate (IQ of 40 to 55), severe (IQ of 20 to 40), and profound (IQ of 20 or below) mental retardation.
To perform his evaluation of Holsey, Dr. Cunningham reviewed “a very large set of records,” which included the results of IQ tests that Holsey had taken in the past; deposition testimony; sworn affidavits;[8] arrest records; and school, Department of Corrections, and other institutional records. Dr. Cunningham also administered to Regina Reeves, Holsey’s sister, the Vineland Adaptive Behavior Scale and the AAMR Adaptive Behavior Scale. He used Reeves because he believed that she is “the most reliable and functional member of [Holsey’s] family.”
Dr. Cunningham testified that Holsey satisfied the first prong of the mental retardation test. He reviewed three IQ tests that Holsey had taken, one in 1980, when he was fifteen years old; one in 2001, when he was thirty-six years old; and one in 2003, when he was thirty-seven years old. Holsey scored a 70, 69, and 71 on those tests. According to Dr. Cunningham, because Holsey took those tests across a twenty-three-year period, the clustering of his IQ score within three points showed “an extraordinarily reliable demonstration of his actual intellectual capability.”
Dr. Cunningham also testified that Holsey was “significantly impaired” in eight of the ten adaptive behavior categories: communication, home living, social interpersonal skills, use of community resources, functional academic skills, self-direction, leisure, and health and safety. He also noted that Holsey’s global adaptive behavior functioning is “in the eight year old range.” And based on Holsey’s score on the 1980 IQ test and other anecdotal evidence, Dr. Cunningham testified that there was an onset of mental retardation before Holsey turned eighteen. For those reasons, Dr. Cunningham testified that Holsey is mildly mentally retarded, “which ... does not reflect a mild disorder, but rather the mild end of a continuum of severe disability.”
b. Dr. Toomer
The next witness Holsey’s collateral counsel presented was Dr. Jethro Toomer, a forensic psychologist whom the court recognized as an expert in that field.[9] He testified that, in December 2001 when Holsey was thirty-six years old, he performed a psychosocial evaluation on Holsey to determine whether Holsey is mentally retarded.[10] As part of that evaluation, Dr. *1244 Toomer administered the 2001 IQ test on which Holsey scored a 69 and administered a WRAT “to assess overall achievement functioning as it relates to a particular grade level.” On the WRAT that Dr. Toomer gave him, Holsey scored equal to the fifth-grade level in reading and spelling, and equal to the fourth-grade level in math.
Dr. Toomer testified that he reviewed “several things,” including Holsey’s school records and “affidavits filed by a variety of family members and people who knew him during his developmental years.” He also interviewed Reeves and administered to her the Scales of Independent Behavior, Revised. Based on all of that information, Dr. Toomer testified that Holsey shows “deficits in a variety of’ adaptive behavior categories and that there is some evidence that he suffered an onset of mental retardation before turning eighteen. In Dr. Toomer’s opinion Holsey is mentally retarded.
c. Regina Reeves
Holsey’s collateral counsel called his oldest sister, Regina Reeves, to testify about his childhood. The first part of her testimony was about Holsey’s upbringing in Detroit. She testified that Holsey often saw their mother and father fight, “[s]ome physical; a lot of verbal.” One time their father hit their mother with the handle of a broom or a mop, and another time their mother set a milk carton and a newspaper on fire and threw them on top of their father, who was confined to a wheelchair.
Reeves also testified about Holsey’s life after their mother moved him and his siblings back to Milledgeville. According to Reeves, their mother suffered from psychological problems, including “depression and some other stuff,” and the family lived in a “horrible” economic situation as their mother struggled to earn enough money to provide for the family. Before she went on welfare, their mother earned money by working long hours in cafeterias, babysitting, and cleaning other people’s homes. Because their mother worked so much, Reeves “more or less played the role as the mother.”
Reeves testified that the family did not always have enough food to eat. Their mother gave eating priority to Holsey’s two younger sisters. Reeves testified about a time when Holsey “got up the nerve to ask for something else to eat and [his mother] made him eat, you know, everything that was left in the pot, the [chicken] bones, the rice, the chicken, everything.”
Reeves said that their mother was hard on her children, especially the oldest three: Reeves, Angela, and Holsey. For example, she was often in a bad mood and regularly spoke negatively about their father. When Reeves, Angela, and Holsey realized that she was in a bad mood, they would try to hide but often with little success. As a result, they suffered a lot of verbal and physical abuse.
Reeves described Holsey as “always quiet, nervous, and small” and said that he stuttered “really bad” until he was “[w]ell into his twenties.” Instead of trying to build up Holsey’s self-confidence or getting him help for his stuttering, their mother would berate and make fun of him. She told him that “he was just like his no-good- *1245 ass daddy” and that “he was going to be a punk and a sissy.” And she told him that he had a “can’t talk ass” and that he couldn’t “talk worth a shit.” She would also “curse[] out [and] humiliate[]” her son. Reeves said that although Holsey wet the bed until he was thirteen years old, his mother never took him to the doctor or tried to help him with that problem.
Reeves testified that “[i]t wouldn’t take much of anything” to set their mother into a violent rage, and she provided examples of the physical abuse Holsey and Angela suffered. According to Reeves, their mother would beat her children “[s]ometimes daily, every other day,” and that sometimes she beat them outside of the home, “[i]n the yard, on the porch[,] [Holsey] got beaten on the corner ... right there near our house.” Reeves said that their mother would beat Holsey with extension cords, shoes, and a broom, and would hold his head under the bathtub faucet as he struggled and cried. She said that those beatings left permanent scars on his body.
Testifying about a specific beating, Reeves recounted:
[0]ne night in particular^ when Holsey was twelve or thirteen,] my mother waited because she knew [he was going to wet the bed] that night. And the mattresses were cheap, and everything, so when he peed the bed you could, the water went right through. And when she heard it she woke him up out of his sleep with an extension cord .... Just beat him with the extension cord and made him go wash up and, you know, clean up the mess.
Reeves also testified that Holsey witnessed his mother abuse his sister Angela in a particularly brutal way on two occasions. On one occasion, she intentionally burned Angela using a wall heater, and on the other, she beat Angela to the point that Angela was unconscious and Reeves and Holsey “thought she was dead.”
Reeves stated that Holsey had never lived on his own and that he could not do household chores, like “taking care of things or cleaning up.” She also thought that Angela had influenced Holsey’s behavior. According to Reeves, Angela had been in prison a number of times, has psychological problems, and was institutionalized as a juvenile. Angela began getting in trouble when she was “really small,” and she and Holsey would often get into trouble together. But Reeves believed that Angela was always the leader and Holsey sometimes got into trouble because of things that Angela had done. Holsey rarely told on Angela and would sometimes cover for her. Reeves stated that after Holsey got out of prison for his robbery conviction and then for his probation violation, he moved in with Angela, which Reeves thought was not a good idea “[b]ecause of how [Angela] lived her life, the people that she had there,” and “the influence that she would have over him.”
2. The Depositions and Affidavits
a. Dr. Mare Einhorn
Holsey’s collateral counsel submitted into evidence the deposition testimony and the written report of Dr. Einhorn, a clinical psychologist who had actually been hired by the State in connection with the collateral proceeding to evaluate whether Holsey is mentally retarded. Dr. Einhorn testified that, in conducting his evaluation of Holsey, he did two things. First, he interviewed Holsey in person and administered psychological testing on April 24 and 25, 2008. Second, he reviewed the records that Holsey and the State provided him, which his written report states are the same records that Dr. Cunningham and Dr. Toomer reviewed in conducting their evaluations.
*1246 During the interview, Holsey told Dr. Einhorn that he had begun reading in prison and that he read books, including the Bible, although he did not read every day. In his report, Dr. Einhorn summarized the interview: “[C]ommunieation adequate. Thought processes were coherent, logical, and goal directed. He did not ask any questions during the examination
Dr. Einhorn administered to Holsey an IQ test and a WRAT. On the IQ test, Holsey scored a 71. On the WRAT, he scored in the first percentile (fourth-grade level) in reading and in the fourth percentile (fifth-grade level) in spelling and math. Based on that psychological testing, Dr. Einhorn testified that Holsey met the first prong of the DSM-IV definition of mental retardation.
Dr. Einhorn also testified that Holsey shows significant deficits in some adaptive behaviors, which is the second prong of the DSM-IV diagnosis for mental retardation. He explained, however, that those deficits and Holsey’s low test scores were not due to mental retardation. Instead, he reported that “cultural deprivation, alcohol abuse, [and] low average to borderline intellect” likely caused “Holsey’s below average test scores and poor overall adjustment to life.”[11] Testifying at deposition, he explained his opinion:
He’s neglected, he’s abused, he drinks, he does poorly in school, he gets into trouble, he starts hanging out with the wrong people, and it’s all pretty predictable. He doesn’t get into lockstep with the mainstream.
He never had the advantages of what most of us would have .... He was culturally deprived. He was psychologically deprived. He didn’t have anything. He was a victim of his circumstances. He didn’t have proper parenting. He didn’t have proper food. He didn’t have a proper education. He didn’t have a father figure at all. He didn’t have really anything.
[H]e’s essentially borderline to low average [in intellectual functioning]. If you throw into the equation alcohol abuse [beginning at an early age], his terrible conditions he grew up in, practically anyone would make a poor adjustment to life ....
In his written report, Dr. Einhorn noted other evidence that was inconsistent with a mental retardation diagnosis:
Mr. Holsey’s mother denied any delays of developmental milestones and these would be expected in true mental retardation .... [T]here is no history of special education placement. Despite his difficult childhood, he managed to learn basic skills that surpassed the expectancy of mentally retarded individuals. For example, in 1996, on the Wide Range Achievement Test[,] he obtained a high school level score in arithmetic .... This included the ability to calculate percentiles. This performance is well within normal limits .... Additional contraindications of subnormal intelligence are seen in the transcripts of telephone calls to his sister, report of his playing poker, and his [sophisticated re *1247 sponses to disciplinary actions] while incarcerated.
Dr. Einhorn also highlighted that, as a Pizza Hut employee, Holsey was an “excellent” dishwasher although he was a poor pizza maker because he could not read ingredients, and that while in prison “he earned the level of trustee and was allowed to drive a truck.” Dr. Einhorn pointed out that, in telephone conversations with Reeves, Holsey “used vocabulary that was well above a mentally retarded vocabulary.” He also testified, “Mentally retarded people don’t play poker or at least don’t understand enough to play poker.”[12]
b. Dr. Shapiro
Holsey’s collateral counsel submitted the deposition testimony of Dr. Shapiro. He is a psychologist whom Holsey’s trial lawyers had hired about two or three months before the trial to perform a general assessment, a general psychological assessment, and an assessment of Holsey’s intellectual, academic, and emotional functioning, but had not called as a witness. Holsey’s trial attorneys had given Dr. Shapiro only one document before he made those assessments' — a two-page summary of Holsey’s family history that they had prepared. In conducting his evaluation, Dr. Shapiro did not review “historical data concerning ... Holsey from school records, [Youth Development Center] records, prison records, [or] prior mental health evaluations.” (In his deposition, Dr. Shapiro testified that he had not needed those records because “[t]o some extent, [they’re] irrelevant ... [because] if someone’s mentally retarded at the time you evaluate them, it’s likely that they were mentally retarded as a child also.”)
Dr. Shapiro met with Holsey for several hours at the Jasper County Jail on December 12, 1996, a little less than two months before the trial. During that interview, Holsey told him that (1) he had been raised by his mother and had grown up without a father figure; (2) he had “stayed in trouble” growing up; (3) he often ran away from home because he was bored and wanted to get out of his house; (4) he would “get a whoopin” whenever he got caught; (5) he regularly skipped school; and (6) when he was fourteen years old, he took a knife to school one day because of “race riots” and found a white student and threatened him. Holsey also told Dr. Shapiro that he had been in foster care because his mother “couldn’t contain him,” that police were called after he “got into a fight” with another foster child, and thereafter he was sent to the Youth Development Center.
After the interview, Dr. Shapiro administered some of the subtests of the Stanford-Binet Intelligence Scale to calculate *1248 Holsey’s IQ. Dr. Shapiro explained that he had administered only some of the Stanford-Binet subtests because others were inappropriate given Holsey’s age, and he had administered all of the subtests that were age-appropriate for Holsey. Using the results of those subtests, Dr. Shapiro determined that Holsey’s IQ was 79.[13] He had also administered the Wide Range Achievement Test, which is scored on the same scale as an IQ test, and Holsey had scored a 93 on the math section. Dr. Shapiro testified at deposition that “it would not be possible or likely for a mentally retarded person to be able to achieve that score.” He did state, though, that he “[pjossibly” had not watched Holsey take the WRAT math section but instead had left the test with Holsey at the jail to be mailed back to him.[14] Other testing done by Dr. Shapiro showed that Holsey was reading at a fourth-grade level.
Based on his evaluation, Dr. Shapiro was of the opinion that Holsey’s intellectual functioning was in the borderline mentally retarded range. Dr. Shapiro testified that he probably had told Prince about his impressions in “a very brief conversation,” but he did not prepare a written report for Prince or Trammel, likely because neither attorney requested one.
Dr. Shapiro further testified that Holsey’s state collateral counsel had provided him with two 3-inch, three-ring binders full of documents, which included Holsey’s school and Youth Development Center records, scores from tests that others had administered, and affidavits from relatives and others who knew Holsey. After reviewing those documents, Dr. Shapiro testified that he still believed that Holsey is not mentally retarded but instead is in “the borderline range.” Dr. Shapiro acknowledged that borderline intellectual functioning means a person is in approximately the bottom fifth percentile of intellectual functioning.
Noting that the DSM-IV states that “the essential feature of antisocial personality disorder is a pervasive pattern of disregard for and violation of the rights of others that begins in childhood or early adolescence and continues into adulthood,” the State asked Dr. Shapiro if Holsey suffers from antisocial personality disorder. Dr. Shapiro responded that he did not have enough information to answer that question. He did testify, however, that Holsey “had some conduct problems early on,” including skipping school and running away from home, bringing a knife to school and putting it to another student’s throat, getting in fights, and robbing a conven *1249 ience store. In his opinion, Holsey’s history of conduct problems would be “contributory to conduct disorder,” which “[i]f it continues until adulthood and becomes a persistent pattern of behavior ... [it becomes] part of his ingrained personality, and ... is now his nature to be antisocial.”
c. Former Teachers
Holsey’s collateral counsel submitted the affidavits of three of his former teachers: Sara Simcox, Annie Howard, and Thomas Lee. They attested that Holsey “wasn’t a very good student”; displayed an “obvious slowness”; suffered serious intellectual limitations; could “barely read”; “just wasn’t playing with a full deck”; and “didn’t have any smarts going for him.” Howard and Lee also provided their impressions of Holsey’s family. Howard attested in her affidavit that she “got the feeling that [Holsey’s mother] didn’t understand how serious [his] limitations were” and added that Holsey’s sister Angela “was constantly having to be removed from the classroom.” Lee provided similar information about Angela, telling the court that he had often seen her “in fistfights with grown men.”
d. Holsey’s Family Members
Holsey’s collateral counsel submitted deposition testimony and affidavits from Bertha Ingram, who is Holsey’s mother’s niece; and from Holsey’s mother. Ingram told the court that Holsey’s home “was always filthy and stunk with the smell of urine and rotting food”; that Holsey’s mother favored her two youngest children and viciously beat Holsey and Angela. According to Ingram, their mother “would plug in a curling iron and whack their little hands with it once it got hot.” She would also lash “them with extension cords, belts, a washer/dryer hose, cooking spoons or anything else she found handy.”' And while beating them, their mother would call Holsey and Angela “ ‘buck teeth mother fucking monkeys’ ” and “ ‘ugly ass bitches.’” She also told the court that Holsey’s mother mocked his inability to read by sometimes putting a book in his hands and saying things like: “ ‘Can you read any of the words in this book, boy?’ ”; “ “What’s wrong with your head anyway?’ ”; and “ ‘You’re good for nothing just like your daddy was.’ ”
Holsey’s mother admitted whipping her children as a form of punishment when they misbehaved, but she denied burning them with a curling iron or beating them with an extension cord or shoes. She also denied that the house was filthy.
Holsey’s collateral counsel also submitted the affidavits of the following people: Rosa Ingram, Holsey’s aunt; Sonya Parks, one of Holsey’s cousins; Henry Holsey, Jr., another of Holsey’s cousins; Linda Ingram, Holsey’s mother’s second cousin; Demetra Holsey, one of Holsey’s younger sisters; and Angela Holsey, one of his older sisters. They provided additional information about Holsey’s limited intelligence and his troubled, abusive childhood.
Rosa Ingram attested in her affidavit that Holsey “definitely couldn’t care for himself’ and that he “needed a lot of guidance and supervision.” Parks attested that she began living with her aunt, Holsey’s mother, in the summer of 1980 and, during that time, Holsey’s mother seemed uninterested in her son.
Henry Holsey, Jr. attested that Holsey “always used simple words, and kept to simple topics” and “learned things really slowly or not at all.” He also noted that Angela, the sister, “was a fighter[;] [s]he would fight in a minute and she would fight anyone.”
Linda Ingram attested ‘that Holsey’s, mother “had very limited skills and simply couldn’t cope with all the responsibilities of being a mother and providing for a fami *1250 ly.” She stated that she had once told a psychologist who was evaluating Holsey’s mother that “she probably was mildly retarded seeing as how she has always depended on Regina [Ingram], and ... her younger daughter Lisa to manage a lot of basic things because she simply couldn’t do them herself.” Without explanation, Holsey’s collateral counsel attached to Ingram’s affidavit the psychologist’s September 28, 2000 evaluation of Holsey’s mother, which had concluded that she was mildly retarded.
Holsey’s sister Demetra attested in her affidavit that she and her sister Lisa (who did not share the same father with Holsey, Reeves, and Angela) “were THE priority to” Holsey’s mother: they “always had better clothes and toys” and they “got more food than the others did at meal times, too.” Holsey’s sister Angela’s affidavit described growing up in their household. She said that their mother often “used all of her breath to embarrass and degrade [Holsey] ..., especially in front of other people.” She would call him a “ ‘sissy boy’ and tell him he was going to grow up to be one of the ‘gals.’ ” According to Angela, she also “called [him] ‘monkey’ and ‘crybaby[1] and yelled an endless stream of obscenities .... ” Angela stated that their mother “would hit [them] for any reason or no reason.” She said, “[Holsey] and I were smacked with anything our mother could find, and it was brutal. We were hit all the time, usually with an electrical cord or watering hose .... If she had the curling iron close by, she’d plug it in and burn us with it.”
e. Former Girlfriends
Holsey’s collateral counsel submitted the deposition testimony and affidavits of three of Holsey’s former girlfriends: Mary Jackson, the girlfriend Holsey told to pick him up in a blue Jeep after he murdered Deputy Robinson while in a red car; Belinda Hawkins; and Louvenia Melchor. They provided information about Holsey’s intelligence level. Jackson testified in her deposition that Holsey communicated better with her four-year-old son than he did with adults. Hawkins testified at deposition that Holsey was “responsible” but “had a mind like a child” and “felt like child’s play was more important to him than, you know, being serious.” And Melchor attested in her affidavit that she had broken up with Holsey because, in her view, he could not “handle the adult responsibilities of being in a serious relationship” and did not have “the smarts of a grown man.”
f. Friends and Neighbors
Collateral counsel submitted the affidavits of Donald Foster, Mary Havior, Catherine Harris, Essie Anderson, Sandra Francis, Joseph Trawiek, and Bertha Simmons. All of them were Holsey’s friends or neighbors. Foster and Havior provided information about Holsey’s intelligence level. Foster, a friend who had known Holsey since they were teenagers, attested in his affidavit that Holsey “was just slow in the head” and did not “have the smarts necessary to make his way on his own.” Havior attested that Holsey had attended her church during the year before he murdered Deputy Robinson, and she recounted how “he could not read along in the hymn book and sing with the rest of the congregation.”
Harris, Anderson, Francis, Trawiek, and Simmons told the court about physical abuse that Holsey suffered at the hands of his mother. For example, Harris, a longtime friend of Holsey’s mother, attested in her affidavit that “it didn’t take anything more than a whim to come over [Holsey’s mother] before ... she’d have a belt or a curling iron in her hand and go to whacking [Holsey].” And Anderson, who lived in Holsey’s neighborhood during the 1970s and early 1980s, attested that Holsey’s *1251 mother was “mean and cruel to her ... kids” and “[a]rmed with old shoes, belts, [or] extension cords ... would wail on [Holsey] until he had welts and abrasions all over his body.” She also described in her affidavit how Holsey’s home was “filthy and dirty with roaches, old garbage and the stench of urine.”
In her affidavit, Francis, who went to school with Holsey, provided more details and referred to Holsey’s home as “the Torture Chamber.” Her affidavit stated that Holsey “regularly took beatings ... in plain view and earshot of everyone else living” in the neighborhood. She attested that Holsey’s mother often “dragged [him] by the arm out into their corner yard and went to lashing at him with an extension cord all the while cursing and yelling at the top of her lungs,” calling him “vile” names like “butthole,” “motherfucker,” “sissy ass,” “stupidhead,” “dumbo,” and “retardate.” She remembered seeing Holsey “running for his life and not caring that he was covered in red welts and wounds.”
g. Coworkers
Holsey’s collateral counsel submitted the affidavits of two former coworkers: Ferrlando Jones, who had testified at the sentencing phase of the trial, and Marion Wingate, who had not. Jones was the assistant manager of the Milledgeville Pizza Hut where Holsey had worked for a time, and in his affidavit, he stated that Holsey “came to work and tried his best every shift” but “was way behind most folks when it came to smarts.” Wingate is a former supervisor at Seaboard Farms, a chicken processing company where Holsey worked in the early 1990s. He attested in his affidavit that none of the tasks the company assigned Holsey were hard or required much thinking.
h. Others
Holsey’s collateral counsel also submitted the affidavits of Kenneth Simmons, the man Holsey stabbed at the Soul Master’s Lounge in 1992; and Scotty Simmons, Kenneth Simmons’ brother. Each of the Simmons brothers attested that Holsey had a rough childhood, with Scotty Simmons noting that Holsey’s mother “used to tear into [Holsey] and beat him to a pulp when he was just a little kid.”
They also submitted the affidavits of Hugh Tucker, Lelia Powell, and Susan Martin, all of whom attested to Holsey’s intelligence level. Tucker is a former supervisor at the Youth Development Center, and his affidavit stated that Holsey “was very limited intellectually”; “not capable of ... abstract reflection”; “lacked the maturity, insight and sophistication typical of his peers”; and “used language like that of a child in grade school rather than what was expected of a fifteen year old.” Powell ran the Powell Attention Home, a home for children in need of special placement outside of their family homes, where Holsey stayed for several weeks in 1980. In her affidavit, she described Holsey as “a slow, simple-minded boy who was way behind the other boys his age.” Martin is an investigator who worked for Holsey’s trial lawyers during his trial, and she attested that, to her, Holsey “was a fairly slow and simple-minded young man.”
3. Department of Corrections Records
Holsey’s collateral counsel also introduced into evidence his official Georgia Department of Corrections records. A February 1984 diagnostic summary in those records reports that Holsey completed the ninth grade and scored within the “dull normal range of general intelligence” on the department’s Culture Fair test.[15] *1252 The summary notes that Holsey “does not appear to be in need of specialized MH/MR treatment services ... [although he] could benefit from routine counseling services relating to development of internal controls over his behavior, control of anger, and aggressive behaviors, and history of significant substance abuse.” It also notes that Holsey’s basic academic levels were too low for him to be placed in vocational training. A 1989 parole review summary, which is in the same set of records, states that: “Since his arrival [in prison] Holsey has made a satisfactory adjustment. He has an average performance rating and is presently enrolled in school at 8.3 grade level.”
Holsey’s Department of Corrections records contain a 1985 disciplinary report from the Georgia Industrial Institute, where he was an inmate during the 1980s. According to that report, Holsey “jumped on” another inmate “because he said something about [Holsey’s] gambling game.” Holsey broke the inmate’s front teeth, bloodied his nose, and gave him “several knots on his head.” Another report in the records shows that in 1988 Holsey and another inmate “jumped on” Billy McGriff and Henry Lewis, injuring McGriff. That 1988 report states that “Holsey ... like[s] to intimidate new inmates.”[16]
The Department of Corrections, records also contain a December 1992 offender profile report. That report states that Holsey potentially has an “Antisocial Personality” and that his “psychological profile suggests a very high risk for being assaultive and/or otherwise violent.” It adds that Holsey “currently is functioning in the average range of intelligence.”[17]
*1253 B. The State’s Evidence
The State called two witnesses at the evidentiary hearing to testily about Holsey’s level of intelligence — Dr. Thomas Sachy and Chief Deputy Sheriff Howard Sills — and it submitted the affidavits of eight others who had some knowledge about Holsey’s intelligence. The State also introduced arrest records and an FBI identification record showing that Holsey had been arrested in 1982 for simple battery, in 1988 for theft by shoplifting, and in 1990 for carrying a concealed weapon.[18]
1. The Witnesses
The State’s first witness on the subject of Holsey’s intelligence was Dr. Sachy, whom the court recognized as an expert in forensic psychiatry. He testified that the State had hired him to evaluate whether Holsey is mentally retarded. He told the court that in conducting his evaluation he had reviewed “the other psychologists’ reports” and a variety of documents, including “many depositions and affidavits of family members and people who worked [with Holsey]” and Holsey’s “school records, etc.” He also personally interviewed Holsey.
Based on his evaluation, Dr. Sachy concluded that Holsey does not meet “the criteria for mental retardation.” Instead, he has borderline intellectual functioning. Dr. Sachy performed a neurological evaluation on Holsey and found that he did not show any signs of neurological deficit. For example, Holsey did not have “the soft, physical signs of craniofacial abnormalities or other physical abnormalities consistent with mental retardation.”
Dr. Sachy also based his conclusion that Holsey is not mentally retarded, in part, on testimony at the trial. For example, the evidence showed that on the night of *1254 the murder, Holsey had asked his, girlfriend to pick him up in a blue Jeep instead of in her maroon car. The significance of that is that Holsey knew the police would be looking for a car that was red, the color of the getaway vehicle. He also told his girlfriend that he wanted to monitor a police scanner at his mother’s house. Dr. Sachy testified that “[t]hose two points ... are actually fairly sophisticated, cognitive patterns of someone who has forethought and intact levels of forethought that ... would be beyond the range of someone with significant [or even mild] mental retardation.” Dr. Sachy also found it important that in telephone conversations conducted while he was in prison, Holsey used “a lot of very high level, abstract words.”[19]
Dr. Sachy also testified that mental retardation indicators can overlap with symptoms of antisocial personality disorder. He explained:
And they can be [easy to mix up], in the fact that someone may think someone with mental retardation is doing poor in school or they’re not there at school or are they just slow, when in reality they have antisocial [personality, disorder], they just don’t fit in well. They don’t enjoy school. They have a tendency to break the rules. And, really, they’re on the road to ... potential for later criminal activity. It can look the same initially ....
He testified that a history of fighting and committing aggravated assaults is more indicative of antisocial personality disorder than mental retardation. He explained that a history of “successful armed robberies or doing fairly well at them” is indicative of antisocial personality disorder and not mental retardation; successful armed robberies are “much more difficult for someone with real mental retardation.”
The State also called as a witness at the evidentiary hearing Howard Sills, the former Chief Deputy Sheriff of Baldwin County and the officer who had arrested Holsey for Deputy Robinson’s murder. Sills testified that he knew Holsey before the arrest because Holsey had been an inmate in the Baldwin County Jail. Based on his interaction with him, Holsey “was certainly not well educated, but [he] never detected anything that [he] would have personally noticed as being mental illness.” Instead, Holsey “was conversant and articulate, for his education” and completed his jail chores satisfactorily.
2. The Affidavits
The State submitted the affidavits of seven current or former employees of the Baldwin County Sheriffs Office who knew Holsey from his time as an inmate at the county’s jail: Jewel Hardage, Jerome Saulsbury, Carolyn Moss, Cathy Alexander, Sonia Harris, Betty Johnson, and Elbert Webb. In their affidavits, they attested that Holsey was “intelligent” and “ordinary,” and he was an inmate who understood and followed instructions.
*1255 The State also submitted the affidavit of Evelyn Luton, the attorney who represented Holsey after he stabbed Kenneth Simmons and shot at Scotty Simmons in 1992. She attested that, although Holsey’s “language was unpolished, there was no doubt in [her] mind after talking with him that he understood his situation and had no problems comprehending the choices available to him.”
C. The State Collateral Court’s Decision
After the evidentiary hearing, the state collateral court concluded that Holsey’s trial lawyers had failed to properly prepare and present mitigating evidence of Holsey’s limited intelligence and troubled, abusive childhood. Holsey II, No.2000-V-604, at 82. The court also concluded that Holsey was prejudiced by that failure. Id. at 80. “In light of this lack of any significant preparation or presentation” of mitigating evidence, the court reasoned, “no one can seriously believe that [Holsey] received the constitutional guarantees of the Sixth Amendment right to effective assistance of counsel.” Id. at 83-84. For that reason, the court granted a writ of habeas corpus with respect to Holsey’s death sentence, vacating that sentence and ordering that Holsey receive a new trial of the sentencing phase only. Id. at 84.
D. The Appeal
The State appealed the state collateral court’s grant of habeas relief. The Georgia Supreme Court unanimously reversed that grant and reinstated Holsey’s death sentence. Holsey III, 642 S.E.2d at 59. The court did “accept, for the purposes of this analysis,” that Holsey had shown that his trial lawyers had performed deficiently by not properly preparing and presenting mitigating evidence of his limited intelligence and troubled, abusive childhood. Id. at 62. The court nonetheless concluded that Holsey had failed to show prejudice, “that ‘there is a reasonable probability ... that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ” Id. at 60 (quoting Smith v. Francis, 253 Ga. 782, 325 S.E.2d 362, 363 (1985)).
The Georgia Supreme Court explained its conclusion that Holsey had failed to show a reasonable probability of a different result despite the witnesses, affidavits, and documents his collateral counsel presented in the evidentiary hearing:
The additional evidence Holsey has presented in his habeas proceedings, some of it contradicted by the [State’s] evidence, is largely cumulative of evidence presented at trial, which highlighted Holsey’s limited intelligence, his troubled and abusive home life, his positive contributions at home and elsewhere, and his mother’s and sister’s mental health issues. Having reviewed both the habeas record and the trial record, including the trial testimony of two of Holsey’s sisters and of other witnesses, the trial deposition testimony of Clifford Holsey, Jr., and the non-testimonial material entered into evidence at trial, this Court concludes that introduction of Holsey’s new evidence at his trial would not have had an impact on the jury’s sentencing deliberations sufficient to help sustain a successful ineffective assistance of counsel claim regarding the sentencing phase.
Id. at 61-62 (citation omitted).
III. THE DISTRICT COURT’S DECISION
After the Georgia Supreme Court reversed the state collateral court’s grant of habeas relief, Holsey filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus. He raised ten claims, including the only one at issue in this appeal: that his trial lawyers rendered ineffective assistance at the sentencing phase by not presenting *1256 enough mitigating circumstances evidence about his limited intelligence and troubled, abusive childhood.
The district court denied the petition. Holsey IV, No: 3:07-cv-129 (CDL), at 27. In doing so, it concluded that the Georgia Supreme Court had not unreasonably determined that the additional mitigating circumstances evidence Holsey’s collateral counsel presented in the state court’s evidentiary hearing was largely cumulative of the evidence Holsey’s trial lawyers presented at the sentencing phase. Id. at 23. The court reasoned that Holsey’s trial lawyers “did, during the sentencing portion of the trial, present evidence of [his] limited intelligence, his abusive home life, his positive contributions to his sisters, and his sister and mother’s mental health problems.” Id. Also, relying on the largely cumulative nature of the additional mitigating circumstances evidence, much of which it found had been contradicted by the State’s evidence, the district court concluded that the Georgia Supreme Court’s decision that Holsey had not shown prejudice was not an unreasonable application of clearly established federal law. Id. at 25-27.
IV. DISCUSSION
Holsey contends that the district court erred in denying his 28 U.S.C. § 2254 habeas corpus petition and should have ruled that his trial lawyers’ performance at the sentencing phase was ineffective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He argues that those lawyers did not properly prepare and present enough available mitigating evidence about his limited intelligence and his troubled, abusive childhood and that, if they had done so, his sentence would have been different. In reviewing a district court’s denial of a § 2254 habeas petition, we review only for clear error the court’s factfindings but review de novo the court’s application of the law to those facts. Johnson v. Sec’y, Dep’t of Corr., 643 F.3d 907, 929 (11th Cir.2011).
To succeed on his ineffective assistance of counsel claim, Holsey has the burden of showing two things under Strickland. Id. at 928. First, he must show that his counsel’s performance was deficient, which means that it “fell below an objective standard of reasonableness” and was “outside the wide range of professionally competent assistance.” Strickland, 466 U.S. at 688, 690, 104 S.Ct. at 2064, 2066; accord Johnson, 643 F.3d at 928; Allen v. Sec’y, Fla. Dep’t of Corr., 611 F.3d 740, 751 (11th Cir.2010); Smith v. Sec’y, Dep’t of Corr., 572 F.3d 1327, 1349 (11th Cir.2009). Courts must review counsel’s actions in a “highly deferential” manner and “must indulge a strong presumption that counsel’s conduct” was reasonable. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. To overcome that strong presumption of reasonableness, Holsey must show that “ ‘no competent counsel would have taken the action that his counsel did take.’ ” Johnson, 643 F.3d at 928 (quoting Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir.2000) (en banc)).
The second thing that Holsey must show is that he was prejudiced by his counsel’s deficient performance, which means “that, but for his counsel’s deficient performance, there is a reasonable probability that the result of the proceeding would have been different.” Id. (citing Strickland, 466 U.S. at 694, 104 S.Ct. at 2068). To find that there is a reasonable probability of a different result “our confidence in the outcome must be undermined by counsel’s deficient performance.” Id. at 929 (citing Strickland, 466 U.S. at 694, 104 S.Ct. at 2068).
In addition to the Strickland two-step showing, Holsey’s ineffective assistance of counsel claim is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism *1257 and Effective Death Penalty Act of 1996. See 28 U.S.C. § 2254(d). Under AEDPA, a federal court may not grant a petitioner habeas relief on any claim that was “adjudicated on the merits” in state court unless the state court’s decision was: “(1) ... contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” Id.-, accord Johnson, 643 F.3d at 929; Allen, 611 F.3d at 744-45; Hammond, v. Hall, 586 F.3d 1289, 1306 (11th Cir.2009). A state court’s application of clearly established federal law or its determination of the facts is unreasonable only if no “fairminded jurist” could agree with the state court’s determination or conclusion. Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011); accord Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004). In our en banc decision in Hill we phrased this standard “more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court’s decision, although others might disagree, federal habeas relief must be denied.” 662 F.3d at 1346; accord Sochor v. Sec’y Dep’t of Corr., 685 F.3d 1016, 1028 (11th Cir.2012) (“In other words, we may issue a writ of habeas corpus only where there is no possibility fairminded jurists could disagree that the state court’s decision conflicts with precedents of the Supreme Court of the United States.” (quotation marks and alterations omitted)).
AEDPA does not impose a complete bar on the relitigation in federal court of claims already rejected in state proceedings. Harrington, 131 S.Ct. at 786; accord Hill, 662 F.3d at 1345. Instead, “[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court’s decision conflicts with th[e] Court’s precedents. It goes no farther.” Harrington, 131 S.Ct. at 786. As the Supreme Court has emphasized:
Section 2254(d) reflects the view that habeas corpus is a “guard against extreme malfunctions in the state criminal justice systems,” not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 2796 n. 5, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
Id. at 786-87.
“If this standard is difficult to meet, that is because it was meant to be.” Id. at 786. It was designed to be difficult in order “to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism.” Martinez v. Ryan, — U.S.-, 132 S.Ct. 1309, 1316, 182 L.Ed.2d 272 (2012). The Supreme Court gave this explanation:
Federal habeas review of state convictions frustrates both the States’ sovereign power to punish offenders and their good-faith attempts to honor constitutional rights. It disturbs the State’s significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.
Harrington, 131 S.Ct. at 787 (citation and quotation marks omitted); accord Calderon v. Thompson, 523 U.S. 538, 555-56, 118 *1258 S.Ct. 1489, 1500-01, 140 L.Ed.2d 728 (1998). For those reasons, “it -will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.” Johnson, 643 F.3d at 910-11.
A.
Because the Georgia Supreme Court denied Holsey’s ineffective assistance of counsel claim based on Strickland’s prejudice step, we review with AEDPA deference its holding that Holsey was not prejudiced by his trial lawyers’ alleged deficiencies at the sentencing phase. See Kokal v. Sec’y, Dep’t of Corr., 623 F.3d 1331, 1345-46 (11th Cir.2010). Like the Georgia Supreme Court, we will assume for present purposes that Holsey’s trial lawyers rendered deficient performance within the meaning of Strickland in regard to the sentencing phase. We will also assume that an attorney rendering constitutionally effective performance would have presented at the sentencing phase the evidence that Holsey’s trial lawyers actually did present at that phase plus all of the additional evidence that his collateral counsel submitted in the state collateral court.
Those two assumptions do not affect the outcome of this case because Holsey has not shown that the Georgia Supreme Court’s holding that he was not prejudiced by his counsel’s assumed deficient performance was based on an unreasonable determination of the facts or is an unreasonable application of clearly established federal law. Holsey has not shown that no fairminded jurist could have concluded, as all seven Justices of the Georgia Supreme Court did, that he has failed to carry his burden of showing that if the additional evidence had been presented there is a reasonable probability of a different sentencing result. Holsey has not shown that the evidence on the prejudice question is so one-sided in his favor that the answer is, as the Supreme Court has phrased it, “beyond any possibility for fairminded disagreement.” Harrington, 131 S.Ct. at 787. He has not shown that the Georgia Supreme Court’s determination of the prejudice issue was so unjustified that it “was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Id. at 786-87; accord Bobby v. Dixon, — U.S.-, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011) (per curiam).
B.
Holsey’s first contention is that the Georgia Supreme Court’s holding that he did not show prejudice was based on an unreasonable determination of the facts. See Appellant Br. 18-28. He argues that it was objectively unreasonable for the court to characterize the evidence of his limited intelligence and troubled, abusive childhood that he presented in the state collateral court as “cumulative” of the evidence he presented at the sentencing phase. Appellant Br. 18. About his limited intelligence, he argues that the jury at the sentencing phase “merely hear[d] an undefined label like ‘borderline mentally retarded,’ ” but the evidence presented at the evidentiary hearing actually explained the deficits that he faced and provided “qualitatively superior information about [his] ... mental capacities.” Appellant Br. 24. About his troubled, abusive childhood, he argues that the jury at the sentencing phase did not hear sufficient “detail about his upbringing.” Appellant Br. 22.
Holsey mischaracterizes the conclusion of the Georgia Supreme Court. The court did not describe the evidentiary hearing evidence as “cumulative” of the evidence presented at the sentencing phase but instead characterized it as “largely cumulative.” See Holsey III, 642 S.E.2d at 61-62. *1259 There is a difference. “Cumulative” may-mean “completely cumulative” or it may not, but “largely cumulative” does not mean “cumulative.” Instead “largely cumulative” means “chiefly cumulative,” “mostly cumulative,” or “more cumulative than not.” See Random House Webster’s Unabridged Dictionary 1084 (2d ed.2001); cf. Lanfear v. Home Depot, Inc., 679 F.3d 1267, 1277 (11th Cir.2012) (“Primarily does not mean exclusively; primarily exclusively means primarily.”).
We have some serious doubt about treating as a factfinding to be reviewed under 28 U.S.C. § 2254(d)(2) the Georgia Supreme Court’s conclusion that the additional evidence at the evidentiary hearing was “largely cumulative” of the evidence presented at the sentencing phase. The “largely cumulative” conclusion does not seem to be a factfinding or a “determination of the facts” that is subject to review under that statutory provision; it seems to be a conclusion in the nature of an application of law to fact. At the very least, it is not a finding or determination of the historical facts of the case. See Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1206 (11th Cir.2009) (explaining that historical facts are the “who, what, where, when, and how of the controversy”). Instead, the term “largely cumulative” seems more of a way of conveying that there was not enough of a difference between the evidence presented during the sentencing phase and the evidence presented in the collateral evidentiary hearing to establish a reasonable probability of a different result.
In Cooper v. Secretary, Department of Corrections, 646 F.3d 1328, 1349 (11th Cir. 2011), however, we did state that the Florida Supreme Court’s conclusion that the petitioner’s collateral hearing evidence in that case was “cumulative to that presented at sentencing” was an unreasonable determination of the facts under § 2254(d)(2). Cooper, though, appears to be an outlier. We could not find any other decision where we have analyzed a state court’s conclusion about the cumulative nature of evidence as a determination of the facts under § 2254(d)(2). Our “unreasonable determination of the facts” analysis in cases other than Cooper has involved determinations of historical facts. See, e.g., Rhode v. Hall, 582 F.3d 1273, 1282-83 (11th Cir.2009) (reviewing under § 2254(d)(2) whether counsel was personally involved in the investigation of mitigation evidence); Carroll v. Sec’y, Dep’t of Corr., 574 F.3d 1354, 1368-69 (11th Cir. 2009) (reviewing under § 2254(d)(2) whether the defendant was mentally retarded); Whisenhant v. Allen, 556 F.3d 1198, 1208 (11th Cir.2009) (reviewing under § 2254(d)(2) whether a judge knew that a motion was not properly served).
Our Cooper decision also appears to conflict with the Supreme Court’s decision in Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). In Cullen the Supreme Court held that the petitioner had not shown that the state supreme court unreasonably applied clearly established federal law, in part, because the Supreme Court decided that the additional mitigation evidence in the state habeas proceedings “largely duplicated the mitigation evidence at trial.” Id. at 1409. The Supreme Court decided for itself that the additional evidence presented in the state collateral proceeding “largely duplicated” the evidence that had been presented at trial. Because federal appellate courts, including the Supreme Court, are not factfinders, see Pullman-Standard v. Swint, 456 U.S. 273, 291-93, 102 S.Ct. 1781, 1791-92, 72 L.Ed.2d 66 (1982); United States v. Noriega, 676 F.3d 1252, 1263 (11th Cir.2012); United States v. Fulford, 662 F.3d 1174, 1181 (11th Cir.2011), the Supreme Court’s “largely duplicated” determination in Cullen is not a factfinding; *1260 if it were, the Supreme Court would not have made it because appellate courts do not make factfindings. So, Cullen indicates that this Court in Cooper should not have treated the “cumulative” determination as a factfinding and that the Georgia Supreme Court’s “largely cumulative” determination in this case probably is not a factfinding.[20]
Nonetheless, the State in this case does not contend that we should not treat that determination as a factfinding for purposes of § 2254(d)(2), and doing so does not affect the result. So we will assume, as Holsey argues, that the determination was one of fact subject to review under § 2254(d)(2).[21] We will not, however, be deciding whether it would have been reasonable to find that the additional collateral hearing evidence was “cumulative” of the trial and sentencing phase evidence because that is not what the Georgia Supreme Court said. It said “largely cumulative,” and we will review for reasonableness that determination, not Holsey’s pruned down revision of it.
C.
As the Supreme Court has observed, “[t]he term ‘unreasonable’ is no doubt difficult to define.” Wood v. Allen, 558 U.S. 290, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010). Despite that difficulty, the Court has explained “that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.” Id. Instead, “if some fairminded jurists could agree with the state court’s decision, although others might disagree,” the state court’s decision is not unreasonable. Hill, 662 F.3d at 1346. To be unreasonable, the error in the state court’s finding must be so clear that there is no possibility for “fairminded disagreement.” Harrington, 131 S.Ct. at 786-87. AEDPA “demands that state-court decisions be given the benefit of the doubt.” Renico v. Lett, — U.S. -, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (quotation marks omitted); accord Morton v. Sec’y, Fla. Dep’t of Corr, 684 F.3d 1157 (11th Cir.2012).
To determine whether the Georgia Supreme Court’s “largely cumulative” determination was an unreasonable one, we compare the trial evidence with the evidence presented during the state postconviction proceedings. In doing so, we keep in mind that the United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in posteonviction proceedings is “cumulative” or “largely cumulative” to or “duplicative” of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes *1261 presented to the jury. See, e.g., Cullen, 131 S.Ct. at 1409-10 (“The ‘new[1] evidence largely duplicated the mitigation evidence at trial. School and medical records basically substantiate the testimony of [the petitioner’s mother and brother. Declarations from [the petitioner’s siblings support his mother’s testimony that his stepfather was abusive and explain that [the petitioner] was beaten with fists, belts, and even wooden boards.” (emphases added)); Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 387-88, 175 L.Ed.2d 328 (2009) (per curiam) (holding that “[s]ome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented” because “[t]he sentencing jury was ... well acquainted with [the petitioner’s] background and potential humanizing features” (quotation marks omitted)); Boyd v. Allen, 592 F.3d 1274, 1297-98 (11th Cir.2010) (finding that much of the evidence presented by the petitioner during postconviction proceedings “was in some measure cumulative” of the trial evidence because “much (although not all) of the ‘new’ testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial” (emphasis added)); Rhode, 582 F.3d at 1287 (“At best, the evidence would have been cumulative, providing more information about [the petitioner’s bad childhood and early exposure to drugs and alcohol.” (emphasis added)); Robinson v. Moore, 300 F.3d 1320, 1347 (11th Cir.2002) (“[M]ost of the new mitigation evidence is cumulative of the nonstatutory mitigating- circumstances presented during resentencing .... While the additional mitigation witnesses procured by [the petitioner’s habeas] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of [the petitioner’s] life, these aspects of his life were nonetheless known to the resentencing jury and trial judge.” (emphases added)); Riley v. Wainwright, 778 F.2d 1544, 1549-51, 1551 n. 14 (11th Cir.1985) (describing as “largely cumulative” the forensic evidence that the petitioner claimed should have been presented at sentencing because that forensic evidence would have only “buttressed]” the points made by other witnesses); Jackson v. Bradshaw, 681 F.3d 753, 769-70 (6th Cir.2012) (holding that evidence presented during collateral proceedings was “largely cumulative” of evidence presented during sentencing because the collateral evidence provided only a “larger pool of information of the same type already offered” at sentencing); Beuke v. Houk, 537 F.3d 618, 645-46 (6th Cir.2008) (holding that the petitioner’s collateral evidence was “largely cumulative” of the evidence presented at trial because it concerned the same “subject matter [as] the evidence actually presented át sentencing”); Paul v. United States, 534 F.3d 832, 842-43 (8th Cir.2008) (holding that “[m]uch of the new [collateral] evidence cited by [the petitioner] [was] largely cumulative of evidence that was presented ... at the penalty phase of the trial” although the collateral evidence might have provided “more detail about [the petitioner]^ difficult and abusive childhood or his compassionate character”); Buckner v. Polk, 453 F.3d 195, 207 (4th Cir.2006) (“To the extent that the Maxwell and Coleman affidavits provide new detail of the stories of [the petitioner]^ brother’s death and his father’s alcoholism, we conclude that this new detail is largely cumulative.”); Hedrick v. True, 443 F.3d 342, 353 (4th Cir. 2006) (“The evidence that [the defendant] had received low scores on intelligence tests administered at an early age is largely cumulative of testimony from Dr. Hawk and [the defendant’s mother during the sentencing phase that he had learning troubles in his youth....”); Baldwin v. Maggio, 704 F.2d 1325, 1334 (5th Cir.1983) (holding that a petitioner was not preju *1262 diced by his counsel’s failure to present “largely cumulative” evidence from several witnesses because “[t]heir testimony would have served only to corroborate the portrait of the man sketched by” other witnesses who had testified at sentencing).
The evidence presented at the sentencing phase of Holsey’s trial and during the collateral evidentiary hearing all goes to one of two chapters of his mitigating circumstances story. One chapter is about his limited intelligence and the other is about his troubled, abusive childhood growing up poor in a home with an absentee father, a mentally challenged, abusive mother, and a violent, mentally challenged sister. Holsey contends, however, that in the state collateral court he told a more detailed version of both those chapters of his story than his trial lawyers told at the sentencing phase of his trial. He argues that those additional details render the Georgia Supreme Court’s “largely cumulative” conclusion unreasonable. We will compare the chapters separately, turning first to a comparison between the sentencing phase and state collateral court evidence about Holsey’s limited intelligence, and then to a comparison of the evidence about his troubled upbringing.
1.
At the sentencing phase, Holsey’s trial lawyers informed the jury that he is a man of limited intelligence. They told that story primarily through the testimony of Holsey’s sister Regina Reeves who was a Deputy United States Marshal. She testified that Holsey performed poorly in school, and was usually assigned to the next grade level instead of actually passing into that grade level, and he dropped out of school before finishing the tenth grade. The jury learned from his school records, which Reeves read to them, that Holsey was “a weak student” and “very slow” and a “poor worker” who “need[ed] help from home” but never got that help. Reeves also read to the jury part of Holsey’s Youth Development Center records, which said that Holsey “functions in the borderline mental retardation range of intelligence,” and she told the jury that another part of those records described how a then fifteen-year-old Holsey was functioning academically at only a third-grade level. Also, one of Holsey’s trial lawyers told the jury in her closing statement that Holsey is “borderline mentally retarded,” a point she reiterated by telling the jury that he “was just assigned [to grades] for school.”
In the state posteonviction proceedings, Holsey presented additional evidence that told a more detailed version of the limited-intelligence story that his trial lawyers had put before the jury in the sentencing phase. Holsey called two psychologists to testify at the evidentiary hearing: Dr. Cunningham and Dr. Toomer. Each psychologist testified that in his opinion Holsey is mildly mentally retarded, which means he suffers from what Dr. Cunningham described as a “catastrophic disability,” although the DSM-TV does not describe it that way, see supra p. 29 n. 7. Holsey also submitted the deposition testimony of two other psychologists — Dr. Einhorn, whom the State had hired to evaluate Holsey, and Dr. Shapiro, who had been hired by Holsey’s trial lawyers before the trial. Those two experts testified that Holsey is not mentally retarded but instead functions in the borderline mental retardation range, which is what the jury had heard during the sentencing phase. Dr. Shapiro added in his deposition testimony that someone in the borderline mental retardation range is in approximately the bottom fifth percentile of intelligence. (During its presentation at the same hearing the State called as an expert witness Dr. Sachy, a psychiatrist, who agreed with Dr. Einhorn and Dr. Shapiro that Holsey is not mentally retarded but instead func *1263 tions in the borderline mental retardation range.)
In the state collateral proceedings, Holsey also submitted the deposition testimony and affidavits of several witnesses who testified or attested that Holsey has limited intelligence. Three of Holsey’s former teachers explained that he “wasn’t a very good student”; displayed an “obvious slowness”; suffered serious intellectual limitations; could “barely read”; “just wasn’t playing with a full deck”; and “didn’t have any smarts going for him.” Family members explained that he “definitely couldn’t care for himself’; “needed a lot of guidance and supervision”; “learned things really slowly or not at all”; and was not very smart. Holsey’s friends and former neighbors told the state collateral court that he “was just slow in the head”; did not “have the smarts necessary to make his way on his own”; and did not have “the smarts of a grown man.” One of Holsey’s former coworkers told the court that “he was way behind most folks when it came to smarts.” Others said that he “was very limited intellectually”; “not capable of abstract reflection”; and was “a slow, simpleminded boy.”[22]
(We will save for later a discussion of the contrary evidence in the form of lay testimony that the State presented at the evidentiary hearing on the question of Holsey’s intelligence. See infra p. 99 n.24.)
As our comparison shows, the limited-intelligence evidence that Holsey presented during the state postconviction proceedings concerned the same “subject matter [as] the evidence actually presented at sentencing,” Beuke, 537 F.3d at 645-46, and primarily was a more detailed retelling of the limited-intelhgence story his trial lawyers told the jury at the sentencing phase. Most of that additional evidence “basically substantiate^]” or “supported]” the testimony of Reeves and the facts in the records put before the jury while she was testifying about Holsey not being intelligent, performing poorly in school, and functioning in the borderline mentally retarded range. See Cullen, 131 S.Ct. at 1435. In other words, the evidence presented in the state collateral court provided a “larger pool of information of the same type already offered,” Bradshaw, 681 F.3d at 770, and merely “amplified the themes [of]” his sentencing phase evidence, Boyd, 592 F.3d at 1298, by expanding on and providing more details and different examples about his limited intelligence, see Robinson, 300 F.3d at 1347. For that reason, a reasonable jurist could determine, as the Georgia Supreme Court did, that the additional evidence about Holsey’s limited intelligence was “largely cumulative” of the evidence presented at trial.
The state collateral court did hear some evidence about Holsey’s limited intelligence that may not have been cumulative, specifically the testimony of two psychologists who diagnosed him as mildly mentally retarded and Dr. Shapiro’s explanation of borderline mental retardation. That some of the limited-intelligence evidence presented in the state collateral court was not cumulative does not mean that the Georgia Supreme Court’s conclusion that the state collateral limited-intelligence evidence was “largely cumulative” was an unreasonable determination of the facts. It wasn’t unreasonable. As we have just described, most of the evidence presented about limited intelligence in the state collateral court was cumulative of the evidence presented at trial. And “mostly” is *1264 “largely.” See Roget’s Super Thesaurus 339 (4th ed.2010) (stating that “mostly” is a synonym for “largely”).
Our decision in Herring v. Secretary, Department of Corrections, 397 F.3d 1338 (11th Cir.2005), is instructive. In Herring, the petitioner argued, among other things, that his trial counsel was deficient and he was prejudiced because his counsel did not “introduce two psychological reports that diagnosed him as suffering from retardation and other organic neurological disorders.” Id. at 1351. We held that the petitioner had not shown prejudice because, among other things, the reports were “cumulative” of the petitioner’s mother’s trial testimony that he had a low IQ and a learning disability. Id. Similar to the jury in Herring, the jury at the sentencing phase in this case heard that Holsey has limited intelligence, functions in the borderline mental retardation range, and performed poorly in school. Some expert testimony diagnosing Holsey with mild mental retardation (contradicted by other expert testimony that he is not mentally retarded) or explaining the term “borderline mental retardation” does not alter the cumulative nature of the rest of the additional evidence about Holsey’s limited intelligence.
2.
We now turn to a comparison of the evidence at the sentencing phase and state collateral hearing concerning Holsey’s troubled, abusive childhood. At the sentencing phase, the jury heard about Holsey’s troubled, abusive childhood from both Clifford Holsey and Regina Reeves and from Holsey’s Youth Development Center records. Clifford told the jury that (1) Holsey grew up in a “rough” home that was infested with cockroaches; (2) Holsey’s mother neglected, abused, and “walked all over” him; (3) Holsey’s mother would curse at, “scold[,] and ... beat” her son; and (4) she often left her children alone at night because she worked nights at Clifford’s club.
Holsey’s sister, Reeves, testified about his troubled, abusive childhood. She told the jury that “things were horrible” for Holsey growing up. She recounted that their mother often beat her three oldest children — Reeves, Angela, and Holsey— which motivated Reeves to escape from their mother’s cruelty by leaving home at age seventeen. Reeves also read to the jury part of Holsey’s Youth Development Center records stating that Holsey “has no supervision at home.” She further explained that their mother was often absent and had once been hospitalized for psychiatric issues and that Holsey never really knew their father. Holsey, she said, “more or less” grew up on the streets. She also told the jury about how Angela, who was a major influence on Holsey, was a violent person who had been hospitalized several times for mental issues.
A summary of a Youth Development Center home evaluation, which was contained in the records that were put into evidence at the sentencing phase, informed the jury that Holsey’s mother “ha[d] no idea how to control [him] without resorting to excessive punishment.” In her closing statement, one of Holsey’s trial lawyers highlighted Holsey’s troubled, abusive “home life,” noting that he “grew up by himself.” She told that jury that he “had nothing that every child deserves to have. He was deprived of everything.”
In the state evidentiary hearing, Holsey’s collateral counsel presented evidence that provided the court with more details about Holsey’s troubled, abusive childhood than the jury had heard at the sentencing phase. Reeves testified in more detail about the verbal, emotional, and physical abuse Holsey had suffered while growing up. She told the court that Holsey had grown up in a “horrible” economic sitúa *1265 tion and that he did not always have enough to eat. She said that their mother was rarely home because she worked day and night, and when she was home she favored his two younger sisters over Holsey, Reeves, and Angela.
Reeves provided details about how their mother verbally and physically abused Holsey. She testified that their mother would curse at and humiliate him, telling him that “he was just like his no-good-ass daddy” and that “he was going to be a punk and a sissy.” Their mother also told Holsey that he had a “can’t talk ass” and that he could not “talk worth a shit.” Reeves provided the state collateral court with examples of the physical abuse Holsey suffered, telling the court that their mother would beat him with an extension cord, shoes, and a broom and would sometimes hold his head under the bathtub faucet. Reeves also said that their mother would beat Holsey because he wet the bed until he was thirteen years old and that Holsey had once seen his mother beat Angela until she was unconscious.
Holsey’s collateral counsel also submitted depositions and affidavits that provided more details about his troubled, abusive childhood. Family members, friends, and neighbors told how his mother verbally abused him, calling him things like a “buck teeth mother fucking monkey[ ]”; a “ ‘sissy boy’ and a “ ‘cry baby.’ ” They also told the court that his mother made fun of his limited intelligence, saying things like: “Can you read any of the words in this book boy?” and “ ‘What’s wrong with your head anyway.” She also would call him a “motherfucker,” “sissy ass,” “stupidhead,” “dumbo,” and “retardate.” Holsey’s sister Demetra told the court that his mother made distinctions between her children, treating her two youngest daughters the best.
Family, friends, and neighbors described the severity of the abuse Holsey suffered at the hands of his mother. A former neighbor told the court that his mother was “mean and cruel to her ... kids,” and others told the court that his mother would beat him for any reason or no reason at all. According to the depositions and affidavits, “while cursing and yelling at the top of her lungs,” she repeatedly unleashed “brutal” beatings on him, using extension cords, belts, a washer/dryer hose, shoes, a hot curling iron, or “anything else she found handy.” During these violent outbursts, Holsey’s mother would “tear into [him] and beat him to a pulp.” A friend even recounted that she had seen Holsey “running for his life and not caring that he was covered in red welts and wounds.”
Others told the court that Holsey’s childhood home was disgusting. His mother’s niece said that it “was always filthy and stunk with the smell of urine and rotting food,” and a former neighbor said his home was “filthy and dirty with roaches, old garbage and the stench of urine.”
As this comparison of the evidence presented at the sentencing phase and at state collateral court’s evidentiary hearing shows, the state collateral court was not the first court to hear about Holsey’s troubled, abusive childhood. Although the court heard more details about that childhood during the evidentiary hearing, the jury at the sentencing had heard about his troubled, abusive upbringing too. Like the evidence Holsey presented in the evidentiary hearing about his limited intelligence, the evidence he presented during the hearing about his troubled, abusive childhood “basically substantiate^]” and “supported]” the story that Holsey’s trial lawyers had put before the jury about how he grew up poor in a filthy home, with a mentally challenged, absentee mother who, when she was around, beat him and ver *1266 bally abused him. See Cullen, 131 S.Ct. at 1435.
The evidence presented during the collateral evidentiary hearing concerned the same “subject matter [as] the evidence actually presented at sentencing.” Beuke, 537 F.3d at 645-46. The collateral evidence provided a “larger pool of information of the same type already offered,” Bradshaw, 681 F.3d at 770, which “amplified the themes [of]” the story that was told to the jury, Boyd, 592 F.3d at 1298, by providing “more information,” Rhode, 582 F.3d at 1287, “more details,” and “different examples” of Holse/s troubled, abusive childhood, Robinson, 300 F.3d at 1347. But the basic story of his troubled, abusive childhood was “nonetheless known to the ... jury” when it sentenced him to death for the malice murder of Deputy William Robinson. Robinson, 300 F.3d at 1347. Because the evidence Holsey presented in the state collateral court about his troubled, abusive childhood was largely cumulative of the evidence he presented at trial, it was not unreasonable for the Georgia Supreme Court to describe it as largely cumulative. At least, fairminded jurists could disagree about whether it was. See Harrington, 131 S.Ct. at 786.
Two decisions, one from the Supreme Court and one from this Court, support our conclusion about this. The first is the Supreme Court’s decision in Cullen. In that case, “[t]he mitigating evidence [at trial] consisted primarily of the penalty-phase testimony of [the petitioner’s mother]” who testified, among other things, that the petitioner’s stepfather was “abusive, or nearly so.” Cullen, 131 S.Ct. at 1408-09. Declarations of the petitioner’s siblings submitted during postconviction proceedings provided new and graphic details about that abuse, including that the petitioner’s “stepfather beat him several times a week” with his fists, belts, and “at least once with a two-by-four board.” Id. at 1424 (Sotomayor, J., dissenting); accord id. at 1410 (majority op.). Even so, the Supreme Court held that the “ ‘new’ evidence” of the abuse suffered by the petitioner “largely duplicated the mitigation evidence [of abuse] at trial” because it “supported] his mother’s testimony that his stepfather was abusive and explained] that [the petitioner] was beaten with fists, belts, and even wooden boards.” Id. at 1409-10. If, as the Supreme Court held, the additional evidence in Cullen “largely duplicated” the evidence at the trial in that case, id. at 1409, the additional evidence in this case was “largely cumulative” of the evidence at the trial in this case. Or at least fairminded jurists could so find, as the five Justices who joined that part of the Supreme Court’s Cullen decision did. See Harrington, 131 S.Ct. at 786.
The second decision that supports our conclusion is the Sochor ease. There, we held that the evidence of “childhood trauma” Sochor presented in the state collateral evidentiary hearing was cumulative of the evidence that had been presented on his behalf at trial. Sochor, 685 F.3d at 1031-32. We explained that “[although Sochor presented evidence during the [state collateral] evidentiary hearing that he suffered severe beatings and head injuries as a child and young adult,” the sentencing judge and jury had heard essentially the same story. Id. at 1031. For example, his “sister testified during the penalty phase that Sochor’s father ... once ‘got ahold of Sochor’s hair, and he kept banging his head against the wall.’ ” Id. (alteration omitted). And Sochor’s father testified at the penalty phase that his mother (not the father) had once “lost her temper and beat Sochor, then banged his head against the wall.” Id. (alteration and quotation marks omitted). We held that evidence was “substantially similar,” id. at 1032, to Sochor’s siblings’ testimony at the evidentiary hearing “that their father had *1267 brutally beaten Sochor when he was a child,” id. at 1023, including his sister’s testimony that “their father usually beat one of the children when he came home from work and that Sochor was his favorite target,” id.
If, as we held, the additional evidence in Sochor was “substantially similar” to the evidence at the trial in that case, the additional evidence in this case was “largely cumulative” to the evidence at the trial in this case. Or at least fairminded jurists could so find. Reeves’ evidentiary hearing testimony and the depositions and affidavits Holsey submitted do bolster Reeves’ and Clifford Holsey’s sentencing phase testimony, and the facts from the records that were introduced at trial, by adding details about the beatings and verbal abuse that Holsey suffered. But those additional details tell the same story that Holsey’s trial lawyers told at the sentencing phase.
The largely cumulative nature of Holsey’s collateral hearing evidence about his childhood is different from the nature of the collateral hearing evidence that we described in Cooper. There we held that a Florida Supreme Court “cumulative” finding was an unreasonable determination of the facts because the evidence presented in the state collateral court did not tell the same story as the evidence presented at trial. See Cooper, 646 F.3d at 1353. In Cooper, the petitioner’s mother had testified at sentencing that the extent of the childhood abuse inflicted on the petitioner “was the emotional abuse of his father not being involved in his life and getting whipped by a belt, sometimes leaving marks” and of seeing his father physically abuse her. Id. Evidence at the state collateral evidentiary hearing, however, showed that the defendant had suffered “horrible abuse” at the hands of his father, id., including being “beaten, punched, and kicked” from the time “he was barely out of diapers,” id. at 1342.
The Florida Supreme Court found that the petitioner’s collateral challenge evidence was “cumulative to that presented at sentencing,” holding that “a substantial part of the information regarding [his] disadvantaged childhood was presented at [his] trial” through his mother’s testimony. Id. at 1353 (quotation marks omitted). We held that was an unreasonable determination of the facts because his mother’s testimony “did not begin to describe the horrible abuse” suffered by the defendant at the hands of his father. Id. Instead, his mother’s trial testimony only told the jury about the petitioner’s absentee father occasionally whipping him with a belt. Id. That was a different story — not just a less detailed one — than the habeas story about the “horrible abuse” that the petitioner actually did suffer. Id. In contrast to the additional evidence presented in the state collateral hearing in Cooper, Holsey’s additional evidence told largely the same story as his sentencing phase evidence, although it did add details and bolster that evidence.
For these reasons, we conclude that the Georgia Supreme Court’s determination that the evidence Holsey’s collateral counsel presented in the evidentiary hearing was largely cumulative of the evidence that his trial lawyers had presented during the sentencing phase of his trial was not an unreasonable determination of fact under § 2254(d)(2).
D.
Holsey’s last contention is that the Georgia Supreme Court was wrong to decide that he did not carry his burden of establishing that he was prejudiced by his trial lawyers’ deficient performance at the sentencing phase of his trial. Prejudice, of course, means “a reasonable probability that, absent the errors, the sentencer ... *1268 would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland, 466 U.S. at 695, 104 S.Ct. at 2069. And a reasonable probability, in turn, means “a probability sufficient to undermine confidence in that outcome.” Johnson, 643 F.3d at 935 (quoting Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009)) (alterations and some quotation marks omitted). In determining whether a petitioner has carried his burden of showing prejudice from his trial counsel’s failure to present all the mitigating circumstance evidence that his collateral counsel presented, courts must “evaluate the totality of the available mitigation evidence- — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweigh it against the evidence in aggravation.” Callahan v. Campbell, 427 F.3d 897, 936 (11th Cir. 2005) (alterations and quotation marks omitted); accord Johnson, 643 F.3d. at 935.
It is not enough for a habeas petitioner to convince a federal court that he was prejudiced by the failure to present the additional mitigating circumstance evidence, that there is a reasonable probability of a different result if it had been presented. Under the unreasonable application clause of 28 U.S.C. § 2254(d)(1), he must establish more because the question for a federal habeas court is “whether the state court’s application of clearly established federal law was objectively unreasonable,” Williams, 529 U.S. at 409, 120 S.Ct. at 1521, and an “unreasonable application of federal law is different from an incorrect application of federal law,” id. at 410, 120 S.Ct. at 1522. Once again, a state court’s application of federal law is unreasonable only if no “fairminded jurist” could agree with the state court’s conclusion. Harrington, 131 S.Ct. at 786; see also Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149; Hill, 662 F.3d at 1346. “[I]f some fairminded jurists could agree with the state court’s decision, although others might disagree, federal habeas relief must be denied.” Hill, 662 F.3d at 1346. So, to prevail, Holsey must establish that no fair-minded jurist could conclude that he was not prejudiced by his trial lawyers’ failure at the sentencing phase to present the additional evidence of his limited intelligence and his troubled, abusive childhood that his collateral counsel presented in the state collateral court. See id. Holsey contends that he has done that, but we disagree.[23]
To begin with, “[t]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak.” Sochor, 685 F.3d at *1269 1030 (alteration omitted); accord Kokal, 623 F.3d at 1347. Not at all. There was, and is, substantial evidence of aggravating circumstances, which makes it more difficult to establish prejudice under Strickland. See Sochor, 685 F.3d at 1030-33 (holding that a petitioner did not establish the prejudice prong of Strickland in part because there was strong evidence of the aggravating circumstance that the murder was “especially heinous, atrocious, and cruel”); Rose v. McNeil, 634 F.3d 1224, 1242 (11th Cir.2011) (holding that a petitioner did not establish the prejudice prong of Strickland in part because there was “substantial evidence in aggravation”); Callahan, 427 F.3d at 938 (holding that strong aggravation “demonstrates the burden a defendant faces when trying to overcome ... harsh aggravating factors with mitigating evidence”); Kokal, 623 F.3d at 1347-48 (finding that the Florida Supreme Court’s holding that a petitioner had not shown prejudice was not an unreasonable application of Strickland in part because “the aggravating circumstances ... are especially powerful”); Rutherford v. Crosby, 385 F.3d 1300, 1316 (11th Cir.2004) (“A third reason why the Florida Supreme Court’s decision that [the petitioner] had not established prejudice is not objectively unreasonable is that this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak.”); Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir.2002) (finding no prejudice in part because of the “strength of the evidence both of [the petitioner’s] guilt and of the aggravating circumstances”); Hall v. Head, 310 F.3d 683, 706 (11th Cir.2002) (holding “that the state court’s calculus as to prejudice was [not] an unreasonable one” in part “because the aggravating evidence is strong”); cf. Williams, 542 F.3d at 1343 (“Further supporting a finding of prejudice is the fact that this case is not highly aggravated.”).
The jury in this case found four statutory aggravating circumstances: (1) Holsey murdered a deputy sheriff, see Ga. Code Ann. § 17 — 10—30(b)(8); (2) he murdered the deputy sheriff while trying to avoid arrest, see id. § 17 — 10—30(b)(10); (3) he murdered the deputy sheriff while committing armed robbery, see id. § 17-10-30(b)(2); and (4) he murdered the deputy sheriff after he had already been convicted of a capital felony — the 1983 armed robbery of a Milledgeville convenience store, see id. § 17-10-30(b)(l).
In addition to those statutory aggravating circumstances, the jury heard evidence about Holsey’s long history of violence against others. When he was fourteen years old, Holsey brought a butcher knife to school, put it to a schoolmate’s throat, and hit that schoolmate in the face. When he was eighteen years old, Holsey robbed a Milledgeville convenience store by smashing the store clerk’s face with a brick. For that violent behavior, Holsey pleaded guilty to and was convicted of armed robbery with serious bodily injury. Then, when Holsey was twenty-six years old, and while still on parole for his first armed robbery conviction, he stabbed a man four times and tried to shoot another person. For that violent behavior, he pleaded guilty to and was convicted of three more crimes: two counts of aggravated assault and one count of possession of a firearm by a convicted felon. The jury heard about all of those violent crimes during the sentencing phase. And, of course, it heard extensive evidence during the trial about how Holsey, when he was thirty years old, robbed yet another convenience store and, while fleeing, murdered Deputy Will Robinson. Holsey’s extensive, escalating history of violence against others, which began at least as early as age fourteen when he put a knife to a schoolmate’s throat and *1270 continued throughout his life, culminating at age thirty in the murder of Deputy Robinson, is a “highly prejudicial aggravating circumstance.” Frazier v. Bouchard, 661 F.3d 519, 533 (11th Cir.2011); cf. Cummings v. Sec’y for Dep’t of Corr., 588 F.3d 1331, 1368-69 (11th Cir.2009) (holding that “details of [the petitioner’s] three prior violent felony convictions” was “damaging testimony”).
In addition to all of the aggravating circumstances evidence that was before the jury, the evidence that came in at the state collateral hearing included more reasons for the jury to give Holsey a death sentence. First, his Department of Corrections records, which Holsey himself put into evidence at the evidentiary hearing, establish that he committed at least one violent act while in prison. While incarcerated in 1985, he “jumped on” another inmate, breaking that inmate’s teeth, bloodying his nose, and bruising his head. See Cummings, 588 F.3d at 1368-69 (holding that evidence of the petitioner’s “repeated involvement in violent incidents while in prison” is “damaging”). Second, the State introduced evidence at the hearing showing that Holsey had been arrested in 1982 for battery, in 1983 for theft by shoplifting, and in 1990 for carrying a concealed weapon.
Finally, it came out during the evidentiary hearing that Dr. Sachy, the State’s expert witness, and Dr. Shapiro, the psychologist Holsey’s trial lawyers had hired to evaluate him, were of the opinion that Holsey’s history of getting in fights, committing aggravated assaults and armed robberies, skipping school and running away from home, and bringing a knife to school and putting it to another student’s throat evidenced an antisocial personality disorder. Although Holsey was never formally diagnosed as having antisocial personality disorder, the testimony of those two experts, and other evidence corroborating what they said, would have been additional aggravating evidence because it indicates that, formal diagnosis or not, Holsey does have an antisocial personality disorder. And that is “a trait most jurors tend to look disfavorably upon” and evidence of which “is not mitigating but damaging.” Kokal, 623 F.3d at 1349 (quotation marks omitted); Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir.2010) (describing as “potentially aggravating” evidence suggesting that the defendant has an antisocial personality disorder). The State could have put that damaging testimony before the jury through either or both of those experts if Holsey’s trial lawyers had called Dr. Cunningham to testify for him, as Holsey’s collateral counsel insist they should have. See generally Cullen, 131 S.Ct. at 1410 (explaining that if a petitioner calls an expert witness to testify at the sentencing phase it “open[s] the door to rebuttal by a state expert”).
Evidence corroborating Dr. Sachy’s and Dr. Shapiro’s opinions was admitted during the sentencing phase. For example, there was a psychiatric evaluation that concluded Holsey suffered a “behavioral/personality disorder, which includes ... [an] antisocial component.” That evaluation noted that Holsey had, albeit barely, “as many antisocial behaviors as must be present in childhood histories of adults who are diagnosed as having antisocial personality disorders.” There was also an offender profile report in the Department of Corrections records, which Holsey himself introduced at the evidentiary hearing, that states that he potentially has an “Antisocial Personality” and his “psychological profile suggests a very high risk for being assaultive and/or otherwise violent.”
In addition to the substantial evidence of aggravating circumstances present in this case, as we have already discussed at some length, the evidence that Holsey presented *1271 at the evidentiary hearing about his limited intelligence and his troubled, abusive childhood was largely cumulative of the evidence his trial lawyers presented at the sentencing phase. The additional evidence he presented in the state collateral proceeding mostly substantiated, supported, and supplemented the themes of Clifford Holsey’s and Reeves’ trial testimony by providing more details and more examples of his limited intelligence and troubled, abusive childhood. See supra pp. 75-90. The cumulative nature of that evidence weakens its usefulness to Holsey on the prejudice inquiry. See, e.g., Cullen, 131 S.Ct. at 1409 (holding that the petitioner did not establish prejudice in part because “[t]he ‘new[1] evidence largely duplicated the mitigation evidence at trial”); Wong, 130 S.Ct. at 387-88 (holding that the petitioner did not establish prejudice in part because “[sjome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented; adding it to what was already there would have made little difference”); Sochor, 685 F.3d at 1031 (holding that a petitioner did not establish prejudice in part because “[m]ost of the ... mitigating evidence that [he] produced in the evidentiary hearing was cumulative of evidence produced at the guilt and penalty phases of the trial”); Boyd, 592 F.3d at 1298 (holding that a petitioner did not establish prejudice in part because “much ... of the ‘new’ testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial”); Robinson, 300 F.3d at 1347 (holding that the Florida Supreme Court’s holding that a petitioner had not shown prejudice was not unreasonable in part because “most of the new mitigation evidence is cumulative of the nonstatutory mitigating circumstances presented during resentencing”); Stewart v. Dugger, 877 F.2d 851, 856 (11th Cir.1989) (observing that additional character witnesses “would not have had an effect on [the jury’s] verdict” because “[s]uch testimony would have merely been cumulative”).
As we have also discussed, Holsey did present some evidence of his limited intelligence during the postconviction proceedings that might not have been cumulative, such as the testimony of Dr. Cunningham and Dr. Toomer that Holsey was mildly mentally retarded, which Dr. Cunningham called a “catastrophic disability,” and the testimony of Dr. Shapiro explaining that someone functioning in the borderline mental retardation range is in approximately the bottom fifth percentile of intellectual functioning. But the potentially mitigating effect of Dr. Cunningham’s and Dr. Toomer’s testimony is weakened because it is contradicted by the testimony of three other mental health experts — Dr. Sachy, Dr. Shapiro, and Dr. Einhorn.[24] All three of those experts testified that Holsey is not mentally retarded but instead functions in the borderline mental retardation range, which is information the jury heard at the sentencing phase. And although the jury did not hear evidence that someone with borderline mental retardation functions in approximately the bottom fifth percentile of intelligence, it did hear evidence that a psychosocial evaluation of Holsey done by two mental health professionals when Holsey was fifteen years old had concluded that he was functioning academically at a third-grade level. And it did hear evidence that Holsey was a “very slow,” “weak student” and *1272 that when he was fifteen years old he scored a 70 on an IQ test.
Finally, this is not a case where the additional evidence presented in the state collateral proceeding “adds up to a mitigation case that bears no relation” to the mitigation case “actually put before the jury.” Rompilla v. Beard, 545 U.S. 374, 393, 125 S.Ct. 2456, 2469, 162 L.Ed.2d 360 (2005). In the four recent cases where the Supreme Court has held that a petitioner established prejudice based on his trial counsel’s failure to present enough mitigating evidence at the sentencing phase, the evidence presented during the postconviction proceedings told a different story than the story told to the jury at trial.
In Porter, for example, “[t]he judge and jury at Porter’s original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.” 130 S.Ct. at 454 (emphasis added). But there was powerful mitigating evidence available on those two topics, including “(1) Porter’s heroic military service in two of the most critical— and horrific — battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling.” Id. Because the sentencing judge and jury “heard absolutely none of that evidence, evidence which might well have influenced the jury’s appraisal of Porter’s moral culpability,” the Court held that Porter had established that he was prejudiced by his trial counsel’s failure to present the evidence and that no fairminded jurist could disagree. Id. 454-56 (emphasis added) (alteration and quotation marks omitted).
The Supreme Court similarly held in Rompilla that a petitioner had established prejudice when the mitigating evidence he introduced in postconviction proceedings “add[ed] up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury.” 545 U.S. at 374, 393, 125 S.Ct. at 2456, 2469. And in Wiggins v. Smith, 539 U.S. 510, 535, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003), the Court held that a petitioner had established prejudice when his trial counsel presented no evidence of his life history although there was “powerful” mitigating evidence available, including that the defendant “experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother”; that he suffered “physical torment” in foster care; and that he had “diminished mental capacities.” Finally, in Williams, the Court held that a petitioner had established prejudice when the mitigation evidence at trial described the petitioner as a “nice boy” and nonviolent, but evidence adduced during the postconviction proceedings graphically described the petitioner’s childhood, “filled with abuse and privation,” and provided evidence that he was “borderline mentally retarded.” 529 U.S. at 369, 398, 120 S.Ct. at 1500, 1515 (quotation marks omitted.)
We have relied on similar reasoning in cases where we have held that a petitioner established prejudice. In Cooper, we held that the petitioner had established prejudice when the trial evidence told the jury that “the extent of the abuse inflicted on Cooper was the emotional abuse of his father not being involved in his life and getting whipped by a belt, sometimes leaving marks,” which “did not begin to describe the horrible abuse testified to by Cooper’s brother and sister” at the collateral evidentiary hearing or even mention the serious physical abuse the petitioner’s brother inflicted on him. 646 F.3d at 1353. And as we explained in Johnson when we held that the petitioner had established prejudice:
The picture [that Johnson’s trial lawyer] painted for the jury was of Johnson *1273 having cold and uncaring parents, something in the nature of the “American Gothic” couple. With a reasonable investigation, though, he could have painted for the jury the picture of a young man who resembled the tormented soul in “The Scream.” There is nothing wrong with a Grant Wood approach, if that is all one has to use, but an Edvard Munch approach would have been far more likely to sway the jury to sympathy for Johnson.
643 F.3d at 936. The contrast between an “American Gothic” type story and “The Scream” type story in our Johnson case and in the Supreme Court’s Porter, Rompilla, Wiggins, and Williams cases is not present here.
To be sure, some of the additional evidence that Holsey’s collateral counsel presented would have been helpful to Holsey during the sentencing phase of his trial. But at this stage of the case, after the state court has adjudicated his claim on the merits, that helpful evidence is not helpful enough. Holsey must show more than that the evidence would have been helpful. He must show that the evidence would have been so helpful that every reasonable jurist, without exception, would have concluded that there is a reasonable probability that the sentence would have been different if the jury had heard all of the aggravating circumstances evidence and all of the mitigating circumstances evidence. He must show not only that the Georgia Supreme Court’s contrary conclusion is wrong but that it is so wrong that ' no fairminded jurist could reach that conclusion. See Harrington, 131 S.Ct. at 786; Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149; Hill, 662 F.3d at 1346; Sochor, 685 F.3d at 1028. He must show that the Georgia Supreme Court’s conclusion was an “extreme malfunction[ ] in the state criminal justice system[]” that is “well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington, 131 S.Ct. at 786-87. Holsey has not shown us that. He has not carried his burden. He has not cleared the high hurdle that § 2254(d)(1) puts in his way.
Given the strong evidence of multiple aggravating circumstances, including Holsey’s extensive, escalating history of violence, the largely cumulative nature of the additional evidence Holsey’s collateral counsel presented in the state collateral proceedings, and the weakened mitigating value of the potentially noncumulative evidence that they presented, a fairminded jurist could agree with the Georgia Supreme Court that Holsey was not prejudiced by his trial lawyers’ assumed deficiencies at the sentencing phase. See Harrington, 131 S.Ct. at 786; Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149; Hill, 662 F.3d at 1346; Sochor, 685 F.3d at 1028. For that reason, we conclude that the Georgia Supreme Court did not unreasonably apply Strickland when it held that he was not entitled to relief.[25]
V.
For the reasons we have discussed, we AFFIRM the district court’s denial of Holsey’s 28 U.S.C. § 2254 habeas corpus petition.

. The State also called two Milledgeville law enforcement officers, whose testimony conroborated Maher’s.

. The State also called Bertha Simmons and Cathey Bell to corroborate the testimony of Kenneth and Scotty Simmons. Bertha Simmons testified that she saw Holsey stab Kenneth Simmons at the Soul Master's Lounge, and Bell testified that she also saw Holsey stab Kenneth Simmons and that she saw Holsey fire a rifle at Scotty Simmons.

. When Reeves testified at Holsey’s trial in 1997 her last name was still Holsey. She married after the trial, taking her husband’s name, and she thereafter testified again in 2003 during the postconviction proceedings. For consistency, we will refer to her as "Reeves” throughout this opinion.

. Holsey also submitted Dr. Cunningham’s written report on those topics.

. As stated in the DSM-IV: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning ... that is accompanied by significant limitations in adaptive functioning in at least two of [ten] skill areas .... The onset must occur before age 18 years ....” DSM-IV, at 41.
*1242 Georgia similarly defines mental retardation as "having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period.” Ga.Code Ann. § 17-7-131(a)(3); accord DSM-TV, at 41. In Stripling v. State, 261 Ga. 1, 401 S.E.2d 500, 504 (1991), the Georgia Supreme Court explained that the "significantly subaverage intellectual functioning” factor of the mental retardation definition "is generally defined as an IQ of 70 or below.” According tq the court, however, "an IQ test score of 70 or below is not conclusive” because "an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate.” Id.; accord Hill, 662 F.3d at 1341 n. 6; see also infra pp. 30-31, 37.

. Dr. Cunningham explained that the Vine-land Scales “provide[] information about how [the patient] compares to community members as opposed to individuals that are mentally retarded.” He also said that the AARM Scales "provide information about how [the patient] compares to other individuals who are developmentally disabled, to other people that are mentally retarded.”

. Unlike Dr. Cunningham, the DSM-IV does not describe mild mental retardation as "a catastrophic disability.” According to the part of the DSM-TV that Holsey’s collateral counsel submitted into evidence at the evidentiary hearing:
Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of “educable.” This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often *1243 are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.
DSM-TV, at 43.

.Dr. Cunningham reviewed affidavits, which Holsey also submitted into evidence during the evidentiary hearing, from the following people: Essie Anderson, Donald Foster, Sandra Francis, Mary Havior, Belinda Hawkins, Angela Holsey, Demetra Holsey, Henry Holsey, Jr., Annie Howard, Rosa Ingram, Ferrlando Jones, Thomas Lee, Billy McGriff, Louvenia Melchor, Lelia Powell, Sonya Rooks, Sara Simcox, Hugh Tucker, Robert Warner, Freda Webb, Dr. Herbert Eber, and Holsey's mother.

. Holsey also submitted Dr. Toomer's written report.

. According to Dr. Toomer:
[A] [p]sychosocial evaluation is ... a kind of history taking. It’s a semistructured interview where the individual is asked a ser *1244 ies of questions regarding his developmental history from birth up to the present time. And as part of that information getting, the individual is observed regarding his overall presentation, clinical presentation, intellectual and cognitive presentation, how the person responds to questions asked, [and] how the individual processes information. All that is part of the observational piece that occurs in conjunction with the taking of the psychosocial history.

. On the subject of causation, Dr. Cunningham testified that cultural deprivation is not inconsistent with mental retardation. He explained:
Mental retardation is independent of cause. And so whether or not your hardware was permanently stunted because you didn't get proper nurturance as a baby, because you were neglected or abused or were impoverished or ate lead paint or were dropped on your head, whatever it is that compromised this hardware in a permanent way, all of that is called mental retardation.

. Dr. Cunningham criticized Dr. Einhorn’s reliance on the purportedly contradictory evidence. For example, he testified that Dr. Einhorn should not have relied on Holsey’s mother’s statements that Holsey did not have delays in developmental milestones. First, according to Dr. Cunningham, the DSM-IV recognizes that mildly mentally retarded children may not have any developmental delays, and second, Holsey’s mother is a poor source of information because she "is mildly mentally retarded or borderline intelligent herself.” He also criticized reliance on the 1996 WRAT test, saying that test "was administered outside of the observation of the examiner” and that he was "surprised that Dr. Einhorn didn’t bring a more critical analysis to bear as he would look at what is so obviously a grossly outlying score.” Dr. Cunningham also thought that, although Holsey did use words in telephone conversations with his sister that were "a little surprising,” Dr. Einhorn had placed too much emphasis on that fact. Finally, Dr. Cunningham disagreed with Dr. Einhorn’s view that doing an excellent job washing dishes and being able to play poker were inconsistent with mental retardation, and said that view "suggests that Dr. Einhorn doesn’t have a clear perception of what someone who’s mildly mentally retarded is capable of and how they function.”

. In his live testimony at the evidentiary hearing, Dr. Cunningham, one of Holsey’s expert witnesses, criticized Dr. Shapiro’s use of the Stanford-Binet Intelligence Scale test in 1996 to calculate Holsey’s IQ. According to Dr. Cunningham, Dr. Shapiro should have given to Holsey thirteen subtests of the test instead of the six subtests that he actually gave. And even if giving the six subtests was appropriate, in Dr. Cunningham’s view Dr. Shapiro had used the wrong standardization table in calculating Holsey's IQ as 79. If he had used the correct table, Dr. Cunningham believed, he would have come up with an IQ of 75.

. Dr. Shapiro testified that he did not recall how he got the WRAT math portion back from Holsey, but his usual practice was to "put the materials in the charge of the correction officer and ask that they make sure the defendant completes the materials and sends it back.” Holsey’s collateral counsel submitted the affidavit of Tanekia Kelly, a former detention officer at the Jasper County Jail. She attested that she remembered Dr. Shapiro meeting with Holsey but that she did not remember Dr. Shapiro delivering any tests or paperwork to her that concerned Holsey. No witness testified, however, that anyone had taken the test for Holsey, supplied him with any answers, or changed any answers that he gave.

. Holsey also submitted the deposition testimony and affidavit of Dr. Herbert Eber, a *1252 psychologist who from 1974 until 1990 or 1991 "ran the processing part” of the Department of Corrections' diagnostic center. In his affidavit, Dr. Eber stated that Holsey look a modified Culture Fair intelligence test in 1984 but that the results of that test "cannot be used as a measure of intelligence” to diagnose mental retardation. He explained that the Department of Corrections does not employ a psychologist to administer the Culture Fair test, the test is not timed, the modified test does not take into account reading skills, and that "the norms used to evaluate the maximum potential IQ at the Georgia Diagnostic and Classification Center were not the norms produced by the [Culture Fair] test's publisher.” Instead, Dr. Eber had developed the norms using a research study of Georgia prisoners, and the test that Holsey was given had been revised "to better suit [the] purposes related to vocational and prison rehabilitation.”

. In an attempt to explain away those disciplinary reports, Holsey’s collateral counsel submitted the affidavits of three people with whom Holsey had served time at the Georgia Industrial Institute: Billy McGriff, Rothman Lewis, and Henry Williams. McGriff attested in his affidavit that Holsey did not like to fight, which made him a target for prison thugs. Lewis attested in his affidavit that Holsey did not start fights in prison and did all he could to avoid fighting. He also said that Holsey had a "rough time of it in prison ... because he was slow in the head.” In his affidavit Williams attested that the Georgia Industrial Institute was a violent prison where an inmate was required to fight to protect himself. He did note that he himself had an altercation with Holsey at the prison, but said that it was "out of character” for Holsey.

. The report does contain this apparently standard disclaimer:
THIS COMPUTER GENERATED REPORT SHOULD BE VIEWED WITH CAUTION. IT MAY NOT ACCURATELY DESCRIBE THIS OFFENDER. THESE STATEMENTS ARE BASED ON THE BEHAVIORS AND HISTORIES OF PERSONS WITH SIMILAR TEST SCORES, INTERVIEW RESPONSES, AND PERSONAL CHARACTERISTICS. THE DIAGNOSTIC AND TREATMENT SUGGESTIONS BELOW SHOULD BE CONSIDERED AS HYPOTHESES WHICH SHOULD BE CONFIRMED OR RULED OUT FOLLOWING EXAMINATION BY THE DIAGNOSTIC STAFF OR OTHER PERSONNEL.

. The State also submitted two affidavits from Julius Roberson. Roberson lived across the street from Holsey during the 1970s and early 1980s. In his first affidavit, which is dated March 28, 2002, Roberson attested that "[Holsey's mother] was outright violent toward [Holsey]” and that "[i]t was gut wrenching for me to see and hear how [she] treated [Holsey] ... and know what incredible abuse they had to endure on an almost daily basis.” He said that he often saw Holsey’s mother whip "him with extension cords, old hoses, or thin branches.” He also attested that Holsey was a "slow learner[],” “empty-headed,” and "naive.”
But in his second affidavit, dated August 20, 2003, Roberson contradicted much of what he had attested to in his first affidavit. He explained that an investigator on Holsey’s collateral legal team had interviewed him and months later returned to his house with a typed affidavit and read parts of it to him. In his second affidavit, Roberson attested that he felt like the investigator was rushing him, and he had signed that first affidavit without reading it himself. And Roberson explained that if the investigator had read all of that first affidavit to him, he would not have signed it. He stated that the first affidavit "contains many things that [he] did not say and several things that [he] told [the investigator] were not true.” For example, he had never said that Holsey was a “slow learner[]”; "empty-headed”; or "naive.” He also attested that Holsey's mother “was fair when she disciplined her kids,” but in the first affidavit the investigator had tried to paint a "totally different” and inaccurate picture. And he stated that he had specifically told the investigator that he had never seen Holsey "whipped with branches, cords, and hoses.”
As the Georgia Supreme court noted, "[t]he record is not developed on the issue of possible intentional misconduct” of the investigator or anyone on Holsey's legal team but we, like the Georgia Supreme Court, find the allegations contained in Roberson’s second affidavit troubling. Holsey III, 642 S.E.2d at 61 n. 2. Those allegations also illustrate the sometimes limited value of affidavits submitted by potential mitigation witnesses who did not testify in the trial or in the evidentiary hearing during the state collateral proceeding. We have observed before that affidavits submitted by habeas petitioners attacking their death sentences are sometimes "artfully drafted.” Putman v. Head, 268 F.3d 1223, 1245 n. 19 (11th Cir.2001).

. Dr. Cunningham, one of Holsey’s expert witnesses who testified at the evidentiary hearing, criticized Dr. Sachy's conclusions. He stated that the absence of physical abnormalities is not inconsistent with a mild mental retardation diagnosis. He took the position that relying on someone's use of vocabulary is not an accepted way of diagnosing mental retardation. He also testified that, “Holsey is deficient when you systematically evaluate [him]. Now, the armchair kind of things that I may pull out, about an interaction with a girlfriend or about the criminal justice system, those are not a substitute nor do they negate the systematic measures that are undertaken.” Although Dr. Cunningham did not otherwise address Dr. Sachy’s reliance on Holsey’s interaction with his girlfriend after he murdered Deputy Robinson, he did testify that there was nothing in Dr. Sachy's report that would cause him to change his opinion that Holsey is mentally retarded.

. The dissenting opinion misconstrues our statements about the Cullen decision. . See Dissenting Op. 1280 n.5. We are not saying that § 2254(d)(2) applies only to a subset of factfindings. Instead, we are pointing out that the Supreme Court and this Court have held that federal appellate courts, of which the Supreme Court is one, do not find facts. It follows that when the Supreme Court determined in Cullen that the evidence presented in the state collateral proceeding “largely duplicated” the evidence at the sentence proceeding, the Court was not finding facts but applying law to fact. And because the Supreme Court’s “largely duplicated” determination in Cullen was an application of law to fact, it follows that the Georgia Supreme Court's "largely cumulative” determination in this case was also an application of law to fact. It is as simple as that.

. The dissenting opinion falsely accuses us of disregarding the Cooper decision. See Dissenting Op. 1279. While we believe that decision is wrong on the question of whether "cumulative” is a factfinding or an application of law to fact, we treat it as correct and binding and explain why this case is distinguishable. See infra pp. 88-89.

. To contradict those depositions and affidavits, at the state postconviction evidentiary hearing, the State called Howard Sills, the former Chief Deputy Sheriff Baldwin County, and submitted the affidavits of eight others. Sills’ testimony and the affidavits described Holsey as an ordinary, intelligent person.

. Holsey also argues that the Georgia Supreme Court’s evaluation of the mitigating evidence he presented at the evidentiary hearing was specifically contrary to the Supreme Court's application of the Strickland standard in Williams v. Taylor. That contention lacks merit. In Williams, the Court held that the Virginia Supreme Court’s conclusion that the petitioner had not established prejudice was an unreasonable application of Strickland because the state court “did not entertain [the] possibility" that “[m]itigating evidence unrelated to dangerousness may alter the jury’s selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.” Id. at 398, 120 S.Ct. at 1516. The Georgia Supreme Court did not make the same mistake in Holsey's case. Nothing in its opinion suggests that it "rested its prejudice determination on the fact that [Holsey’s] mitigating evidence did not undermine or rebut the evidence supporting the aggravating circumstance[s].” Williams v. Allen, 542 F.3d 1326, 1344 (11th Cir.2008). Instead, the court explicitly examined the totality of Holsey's available mitigation evidence and weighed it against the evidence of aggravation. After doing so, the court concluded that the available mitigation evidence did not undermine its confidence in the jury's death sentence recommendation. See Holsey III, 642 S.E.2d at 61-62.

. Also, much of the nonexpert evidence that Holsey presented at the evidentiary hearing about his limited intelligence — that is, the depositions and affidavits from his family, friends, neighbors, teachers, coworkers, and others — was contradicted or counterbalanced by the State’s evidence about Holsey’s intelligence level. See supra pp. 56-57, 78 n. 22.

. We do not address whether we would have ’ concluded under a de novo standard that there was no prejudice, just as the dissenting opinion does not address whether it would have concluded under § 2254(d)(l)'s standard that the Georgia Supreme Court’s determination that .there was no prejudice was “contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).

. It seems to me that the incidence of long opinions has been on the rise in the last decade or, at least, more are coming across my desk. I should say that I, broadly speaking, do not agree that the length of an opinion necessarily reflects the thought, labor, and care that has been invested by judges in their endeavor to decide the case correctly. The shorter opinions often reflect the greater study and thought leading up to the ultimate decision. Mark Twain touched on a related idea: "If you want me to give you a two-hour presentation, I am ready today. If you want only a five-minute speech, it will take me two weeks to prepare.” Nevertheless, that some cases might truly demand long opinions, I do not doubt. And I believe I understand why Judge Carnes has gone longer in this case.